# CENTRAL RAILROAD COMPANY *v.* KEEGAN.

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 873. Submitted December 8, 1894. — Decided December 23, 1895.

A force of five men, in the night service of a railroad company, was employed in uncoupling from the rear of trains cars which were to be sent elsewhere, and in attaching other cars in their places. The force was under the orders of O., who directed G. what cars to uncouple, and K. what cars

to couple. As the train backed down, G. uncoupled a car as directed. K., in walking to the car which was to be attached to the train in its place, caught his foot in a switch and fell across the track. As the train was moving towards him he called out. The engine was stopped, but the rear car, having been uncoupled by G., continued moving on, and passed over him, inflicting severe injuries. K. sued the railroad company to recover damages for the injuries thus received. *Held*, that K. and O. were fellow-servants, and that the railroad company was not responsible for any negligence of O. in not placing himself at the brake of the uncoupled car.

THE action below was brought by Keegan to recover damages for personal injuries sustained while acting as brakeman in the employ of the railroad company. Judgment having been rendered upon the verdict of a jury, in favor of Keegan, the company sued out a writ of error from the Circuit Court of Appeals for the Second Circuit. Two circuit judges, sitting as the court, differed in opinion upon questions of law arising, and thereupon certified two questions to this court. The certificate sets forth the following statement of facts:

"Five men — O'Brien, Keegan, Lally, Gooley, and Ward — were, on the night of the accident, (October 7, 1889,) in the service of the Central Railroad of New Jersey, and employed in its yard at Jersey City. They comprised what was called the 'night float drill crew,' the duty of such crews being to take cars from the tracks on which they had been left by incoming trains and place them on the floats, by which they were transported across the North River to the city of New York. The drill crews, like others employed in the same yard, received their general instructions from Dent, the yardmaster. The men composing such crews were hired by Dent and discharged by him, and he had the general charge of the yard and yardmen, and assigned them to their duties.

"The course of business was as follows: Dent, the yardmaster, gave to O'Brien drill slips — that is, slips of paper containing the numbers of the cars and the particular tracks leading to the floats on which these cars were to be placed. These float tracks were five in number and were connected, by switches, with the other tracks in the yard. The execution of this order required frequent switching of cars from one

set of tracks to another in order to sort out from arriving trains the particular car or cars to be placed on a particular float track. It also required the making up of trains of cars sometimes longer, sometimes shorter; their movement by the engine attached to them, forward or backward and at varying rates of speed; the braking, coupling, and uncoupling of the cars composing them. Ward was engineer. Lally had his post on some car near the engine in order to transmit to the engineer any signals received. He also helped the engineer with coal and water, and acted as brakeman. Keegan did the coupling; Gooley the uncoupling and acted as brakeman, while the turning of the switches was attended to by O'Brien. The direction of all these operations was with O'Brien, who is called in the evidence sometimes 'foreman driller,' sometimes 'conductor of the drill crew.' He was the one to direct what cars should be taken on by the engine, and when and where they should be moved to, when the movement should start, and where it should stop, and it was in obedience to his orders that one or another of the men employed in his crew went to one place or another and coupled or uncoupled particular cars. The general management of the operation was with him, and he had control over the persons employed therein.

"On the night of the accident Keegan, who had been relighting his lantern at the engine, which was then standing still, attached to several cars, walked to the rear end of the train. O'Brien and Gooley were standing there looking over the drill slip. There were some other cars standing on the same track, about 40 feet beyond the end of the cars to which the engine was attached. O'Brien told Gooley what cars were to be uncoupled. He then told Keegan to couple the train onto the cars beyond. Keegan took the coupling link of the rear car in his right hand, and, having signalled for the train to back slowly, walked towards the detached cars, with the rear end of the last car at his back. Before he reached them he caught his right foot in the guard rail of a switch, and at once called out to hold up the train. His call was heard and the engine stopped immediately. Gooley, however,

had already, on O'Brien's order, drawn the pin and thus uncoupled the cars indicated, so that when the engine pulled up it did not stop their backward movement. Neither Gooley nor O'Brien were on the cars thus moving backwards, so there was no one to check their motion by applying the brakes, and as a consequence the rear wheel passed over Keegan's leg, producing the injuries complained of.

"There was evidence tending to show that under circumstances such as these O'Brien or some one else should have been on the rear car of those moving backward, and the negligence complained of was his ordering defendant in error to couple cars which he had just ordered to be uncoupled from a backwardly moving train to stationary cars beyond them without himself being on the moving cars or seeing that either Gooley or Lally were there to exercise control over their movement.

"The jury, by their verdict, found that O'Brien was negligent."

The questions of law arising from these facts, upon which the court desired instruction for the proper decision of the writ of error, were certified as follows: 1, whether the defendant in error and O'Brien were or were not fellow-servants; and, 2, whether from negligence of O'Brien in failing to place himself or some one else at the brake of the backwardly moving cars, the plaintiff in error is responsible.

*Mr. Robert W. De Forest* and *Mr. George Holmes* for plaintiff in error.

*Mr. A. G. Vanderpoel* for defendant in error.

*Chicago, Milwaukee & St. Paul Railway* v. *Ross,* 112 U. S. 337, stands as the law to-day. In that case the conductor of the freight train was present. In *Baltimore & Ohio Railroad* v. *Baugh,* 149 U. S. 368, there was no conductor present. *Northern Pacific Railroad* v. *Hambly,* 154 U. S. 349, may be regarded as the judicial construction of the relation of the *Baugh case* to the *Ross case.*

The test of liability of the master for the act of a servant is given in the *Ross case*, in the following words : "The conductor has entire control and management of the train to which he is assigned. He directs when it shall start, at what speed it shall run, at what station it shall stop, and for what length of time, and everything essential to its successful movements, and all persons employed on it are subject to his orders." These words are cited with approval in the *Baugh case*. In the *Hambly case* it is said, of the *Ross case:* "The case was decided not to be one of fellow service upon the ground that the conductor was in fact, and should be treated as, the personal representative of the corporation, for whose negligence it is responsible to subordinate servants. The court drew a distinction between servants of a corporation exercising no supervision over others engaged with them in the same employment and agents of a corporation clothed with the control and management of a distinct department, in which their duty is entirely that of direction and superintendence. In that particular case the court found that the conductor had entire control and management of the train to which he was assigned, directed at what time it should start, at what speed it should run, at what stations it should stop, and for what length of time, and everything essential to its successful movements, and that all persons employed upon it were subject to his orders. The word 'orders' referred to the orders of the conductor.

Under such circumstances he was held not to be a fellow-servant with the fireman, brakeman, and engineer, citing certain cases from Kentucky and Ohio."

O'Brien was a conductor, and the proximate cause of plaintiff's injury was his, O'Brien's, negligent order to Gooley to pull the pin, and it is respectfully submitted that the giving that order was a negligent masterial act in law.

MR. JUSTICE WHITE, after stating the case, delivered the opinion of the court.

We held in *Baltimore & Ohio Railroad Company* v. *Baugh*,

149 U. S. 368, than an engineer and fireman of a locomotive engine running alone on a railroad, without any train attached, when engaged on such duty, were fellow-servants of the railroad company, hence that the fireman was precluded from recovering damages from the company for injuries caused, during the running, by the negligence of the engineer. In that case it was declared that: "*Prima facie*, all who enter the employment of a single master are engaged in a common service, and are fellow-servants. . . . All enter in the service of the same master to further his interests in the one enterprise." And whilst we in that case recognized that the heads of separate and distinct departments of a diversified business may, under certain circumstances, be considered, with respect to employés under them, vice-principals or representatives of the master, as fully and as completely as if the entire business of the master was by him placed under the charge of one superintendent, we declined to affirm that each separate piece of work was a distinct department, and made the one having control of that piece of work a vice-principal or representative of the master. It was further declared that "the danger from the negligence of one specially in charge of the particular work is as obvious and as great as from that of those who are simply coworkers with him in it; each is equally with the other an ordinary risk of the employment," which the employé assumes when entering upon the employment, whether the risk be obvious or not. It was laid down that the rightful test to determine whether the negligence complained of was an ordinary risk of the employment was whether the negligent act constituted a breach of positive duty owing by the master, such as that of taking fair and reasonable precautions to surround his employés with fit and careful coworkers, and the furnishing to such employés of a reasonably safe place to work and reasonably safe tools or machinery with which to do the work, thus making the question of liability of an employer for an injury to his employé turn rather on the character of the alleged negligent act than on the relations of the employés to each other, so that, if the act is one done in the discharge of some positive duty of

the master to the servant, then negligence in the act is the negligence of the master; but if it be not one in the discharge of such positive duty, then there should be some personal wrong on the part of the employer before he is liable therefor.

There is nothing in the later decision of this court in Northern Pacific Railroad Company v. Hambly, 154 U. S. 349, militating against the views expressed in the Baugh case. On the contrary, that case is approvingly referred to, (p. 359,) although said there to involve a different question from that which was in the Hambly case.

The principles thus applied, in the case referred to, are in perfect harmony with the rules enforced by the Supreme Court of the State of New Jersey, within whose territory the accident happened which gave rise to the present controversy.

In O'Brien v. American Dredging Co., 53 N. J. Law, 291, 297, O'Brien sought to hold the company liable for an injury sustained by him while employed as a deck hand on one of their dredges, at the time used in dredging the James River, near Richmond, under a contract with the United States government. The ground of liability alleged was that the injury had been caused by the negligence of another employé, one Cannon, who was called the "captain" of the dredge. Cannon was authorized to employ men to work on the dredge, subject to the approval of the general superintendent, (who had his headquarters at the home office of the company,) who had power to disapprove or discharge them; the duty of the captain was to operate the dredge in said dredging; plaintiff was employed by Cannon as a deck hand on the dredge, and his duty was to aid in the operation of the dredge; and Cannon had charge of the men so employed and they were under him. The court held that while Cannon was entrusted with some authority to employ the workmen, yet with respect to the operation of the dredge in the prosecution of defendant's business, he was not a general superintendent, but a mere foreman of the gang of workmen, engaged with them in the execution of the master's work. He was a superior, and they

were inferior workmen, but all were employed in a common operation, though in different grades of service. In the course of the opinion, on the question of the risks which, it must be contemplated, are assumed by one entering the service of another, the court said:

"Whether the master retain the superintendence and management of his business, or withdraw himself from it and devolve it on a vice-principal or representative, it is quite apparent that, although the master or his representative may devise the plans, engage the workmen, provide the machinery and tools, and direct the performance of work, neither can, as a general rule, be continually present at the execution of all such work. It is the necessary consequence that the mere execution of the planned work must be entrusted to workmen, and, where necessary, to groups or gangs of workmen, and in such case that one should be selected as the leader, boss, or foreman to see to the execution of such work. This sort of superiority of service is so essential and so universal that every workman, in entering upon a contract of service, must contemplate its being made use of in a proper case. He therefore makes his contract of service in contemplation of the risk of injury from the negligence of a boss or foreman, as well as from the negligence of another fellow-workman. The foreman or superior servant stands to him, in that respect, in the precise position of his other fellow-servants."

Applying the principles announced by this court and the Supreme Court of New Jersey to the facts of the case at bar, it is clear that O'Brien and Keegan were fellow servants. O'Brien's duties were not even those of simple direction and superintendence over the operations of the drill crew; he was a component part of the crew, an active coworker in the manual work of switching, with the specific duty assigned to him by the yardmaster of turning the switches. He was subordinate to the yardmaster who had jurisdiction over this and other drill crews, and it was the yardmaster who employed and discharged all the workers in the yard, giving them their general instructions, and assigning them to their duties. O'Brien's control over the other members of the drill crew

was similar to the control which a section foreman exercises over the men in his section; and, following its construction of the decisions of this court in the *Baugh* and *Hambly* cases, the Circuit Court of Appeals for the Eighth Circuit has held that a section foreman is a fellow servant of a member of his crew, and that one of the crew injured by the negligence of the foreman could not recover. *Kansas & Arkansas Valley Railway* v. *Waters,* 70 Fed. Rep. 28.

In *Potter* v. *N. Y. Central & Hudson River Railroad,* 136 N. Y. 77, employés of a railroad company, while switching cars in the company's yard, under the direction of a yardmaster, shunted a number of cars onto a track so that they collided with a car being inspected, and caused the death of the inspector. It was claimed that proper and reasonable care required that there should have been a brakeman on the front of the cars to control in an emergency their motion, when detached from the engine. In the absence of allegation of proof to the contrary, the court presumed that competent and sufficient servants were employed, and proper regulations for the management of the business had been established, and observed (p. 82): "It is quite obvious that the work of shifting cars in a railroad yard must be left in a great measure to the judgment and discretion of the servants of the railroad who are entrusted with the management of the yard. The details must be left to them, and all that the company can do for the protection of its employés is to provide competent coservants, and prescribe such regulations as experience shows may be best calculated to secure their safety."

We adopt this statement as proper to be applied to the case at bar. A personal, positive duty would clearly not have been imposed upon a natural person, owner of a railroad, to supervise and control the details of the operation of switching cars in a railroad yard; neither is such duty imposed as a positive duty upon a corporation; and if O'Brien was negligent in failing to place himself or some one else at the brake of the backwardly moving cars, such omission not being the performance of a positive duty owing by the master, the plaintiff in error is not responsible therefor.

These conclusions determine both questions certified for our decision, and, accordingly, the first question is answered in the affirmative, and the second in the negative.

*So answered.*

MR. CHIEF JUSTICE FULLER, MR. JUSTICE FIELD, and MR JUSTICE HARLAN dissented.