### CENTRAL R. R. OF NEW JERSEY v. KEEGAN.

(Circuit Court of Appeals, Second Circuit. July 21, 1897.)

MASTER AND SERVANT—ACTION FOR PERSONAL INJURIES—INCOMPETENCY OF FELLOW SERVANT.

In an action by an employé for personal injuries, the incompetency of the foreman in charge of the work and crew affords no ground of recovery, if it appears that the injuries were caused by the carelessness of another member of the crew in executing the foreman's orders to uncouple cars, but in a manner not directed by the foreman.

In Error to the Circuit Court of the United States for the Eastern District of New York.

This case comes here upon writ of error to review a judgment of the circuit court, Eastern district of New York, entered upon the verdict of a jury in favor of defendant in error, who was plaintiff below. The action was brought to recover damages for personal injuries sustained by plaintiff while in defendant's employ.

George H. Holmes, for plaintiff in error.

A. G. Vanderpoel, for defendant in error.

Before LACOMBE and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. At the time of the accident, plaintiff, with four other men, was engaged in drilling cars in the Jersey City yard of defendant. These men were O'Brien, conductor, or foreman driller; Keegan, the plaintiff, coupler; Lalley, signal man; Gooley, pin puller; and Ward, the engineer. All these men were fellow servants. Railroad Co. v. Keegan, 160 U. S. 259, 16 Sup. Ct. 269. The course of business was as follows: Dent, the yard master, gave to O'Brien drill slips; that is, slips of paper containing the numbers of the cars, and the particular tracks leading to the floats on which these cars were to be placed. The carrying out of these directions required frequent switching of cars from one set of tracks to another, in order to sort out from arriving trains the particular car or cars to be placed on a particular float track. It also required the making up of trains of cars, sometimes longer sometimes shorter; their movement, by the engine attached to them, forward or backward, and at varying rates of speed; the braking, coupling, and uncoupling of the cars composing them. The general management of the opera-

tion was with O'Brien, and he had control over the persons employed therein. The plaintiff had worked in this yard before, and had some previous experience in working on other railroads and yards, although this was the first time he had worked with this particular crew. He went to work at about half past 7 in the evening. About 2 a. m., having relighted his lantern at the engine, which was then standing still, attached to several cars, plaintiff walked to the rear end of the train. O'Brien and Gooley were standing there, looking over the drill slip. There were some other cars standing on the same track below the switch, and about 40 feet beyond the end of the cars to which the engine was attached. Plaintiff's own story is that, when he came up to O'Brien and Gooley, they were reading this list of their work; that O'Brien said to him, "You make that coupling, and back them all down clear." The coupling indicated was between the rear end of the last car of the train and the forward end of the first car of those above referred to as being below the switch. Gooley, who was present and heard this order, confirms plaintiff's statement, and adds that O'Brien told him (Gooley) at the same time what cars to cut off. Keegan took the coupling link of the rear car in his right hand, and, having signaled for the train to back slowly, walked towards the detached cars, with the rear end of the last car at his back. Before he reached them he caught his right foot in the guard rail of a switch, and at once called out to hold up the train. His call was heard, and the engine stopped immediately. Gooley, however, had already drawn the pin, and thus uncoupled the cars indicated to be cut off, so that when the engine pulled up it did not stop the backward movement. Neither Gooley nor O'Brien was on the cars thus moving backward, so there was no one to check their motion by applying the brakes; and as a consequence the rear wheel passed over Keegan's leg, producing the injuries complained of. It appears from the evidence that it is not customary to back cars, when they are to be coupled to others still further behind, unless the moving cars are coupled to the engine, and that, when cars are "kicked back" (i. e. uncoupled and then pushed back), some one is stationed on the rear car to operate the brake. The plaintiff's evidence is most positive that, during the six hours the crew were engaged in this same work, invariably, "when a coupling was to be made, the engine kept right fast to the cars till the coupling was made," and the cars to be cut off were uncoupled afterwards. There is sufficient in the evidence to sustain a finding that Keegan's injuries resulted as plaintiff contends, because on this occasion the cars to be cut off were uncoupled from the moving train before it had backed up and been coupled to the cars below the switch, and a further finding that such uncoupling was negligent should not be disturbed. The theory upon which it is contended that the defendant is liable is that O'Brien was an incompetent man, of whose incompetency the defendant had notice, wherefore defendant should be held negligent, and should respond in damages for the results of O'Brien's incompetency, even to a fellow servant. The greater part of the testimony, and nearly the whole argument, are addressed to this proposition that O'Brien was incompetent. It overshadows the whole case. Before defendant can be held liable,

however, for damages resulting from an accident, on the theory that one of defendant's employés was notoriously incompetent, it must appear that his incompetency caused the injury; and this must be shown either by direct proof, or by evidence fairly warranting such inference. A jury should not be allowed to guess at it, without proof. The cause of the injury in this case was the uncoupling of the cars while in motion, and it seems to have been assumed by the trial judge that O'Brien directed this to be done. Thus, in the charge, we find:

"Now, was the cutting off of those cars, or, rather. the directing them to be cut off, by O'Brien, an improper act, a negligent act, such an act as a competent and suitable conductor would not have done? * * * If so, the plaintiff is entitled to recover," etc.

When we turn to the record, however, which contains all the testimony, we find nothing to sustain a finding that O'Brien gave any such order. Only three men were present when the order was given, —the plaintiff, Gooley, and O'Brien himself. O'Brien died before the trial, and the plaintiff says he did not hear the instructions to Gooley; that he left immediately after receiving his own order. Gooley, therefore, who is called for the plaintiff, is the sole witness to what was said, and this is his whole testimony on the subject:

"I remember well enough when he gave me the orders that we were almost together,—the three of us. O'Brien had his drill slip in his hand." "As near as I can remember, we were coming up after we coupled up to those cars. We pulled up, and Mr. O'Brien told me what cars to cut off, and how to cut them; and I went up above the switch, and I cut those cars off. I don't remember how many it was. I think it was two or three, but probably there might have been more. * * * Q. By whose orders did you pull the pins? A. Mr. O'Brien told me while we were pulling up how many cars to cut off, and, as soon as we got over the switch, then I cut the cars off, or while we were backing down, rather. Q. While the cars were being backed down you pulled the pin and cut the cars? A. Yes, sir. Q. So that the cars were moving when you cut them, weren't they? A. Yes, sir; they were moving. Q. And that was at O'Brien's order,—the conductor? A. O'Brien didn't tell me at that time to cut the cars off, but he told me while we were pulling up out of the track how many cars to cut off. Probably we had hold of ten cars, and probably we cut two off, and one, and three, and then he told me what cuts to make; and as soon as we got above the switch I cut them off, while we were backing down." While they were at work that evening, before the accident, "O'Brien's orders were issued in the same way as on this occasion; simply telling you what to do,—what to cut off and what to couple."

Gooley was the "pin puller" of this gang. He had switched cars for a good many years. There is no suggestion that he was not a competent man, quite capable of executing such orders as might be given to him in a proper manner, without specific supervision. For six hours this same night he had been receiving orders to cut off cars issued in this same way, and there is nothing to show that in obeying any of those earlier orders he cut off cars while the train was backing down to couple. Having coupled up some cars, and while they are being hauled forward [up], O'Brien consults his drill list, and tells Gooley what cars to cut off next, but gives no instructions to cut them off otherwise than in the usual way at the usual time. Under these circumstances, we are not satisfied that O'Brien is to be held responsible because Gooley drew the pin while the cars are moving

backward, instead of waiting till they stopped. Since it was through no fault of O'Brien that the pin was drawn too soon, and since it was such a premature drawing of the pin which caused the accident, the question whether or not he was generally competent to discharge his duties is immaterial. Assuming that plaintiff was not himself negligent, the accident seems to have been caused by the carelessness of Gooley, a fellow servant, for whose negligence defendant would not be liable.

At the close of the whole case, defendant moved for the direction of a verdict on the ground that—

"There is not sufficient proof in law to sustain a verdict for the plaintiff; that the accident resulted from a danger incident to the nature of the employment in which the plaintiff was engaged: that the plaintiff assumed all the risk of the dangers he alleges caused the accident: that, if there was any negligence, it was the negligence of a fellow servant or servants, for which defendant is not liable; that there is no negligence proven against the defendant: that, if there is any evidence in the case that O'Brien was incompetent, the evidence in the case which is claimed to show that he was incompetent is not sufficient to prove that the accident was caused by reason of any of the defects which it is claimed existed in O'Brien; that it was not the approximate cause of the accident."

The exception to the court's refusal to make such direction sufficiently presents the point above discussed. The judgment appealed from is reversed.