## THOMAS v. CINCINNATI, N. O. & T. P. RY. CO.

(Circuit Court, D. Kentucky. April 13, 1899.)

1. MASTER AND SERVANT—RAILROADS—RELATION OF YARD MASTER—FELLOW SERVANTS.

A yardmaster of a railroad, who is made responsible for the condition of the yards at the terminus of a division, directs the incoming and the starting of trains, and is authorized to employ and discharge men, but who is subject to the orders of the superintendent and train master, is a fellow servant of the foreman of a switching gang employed in the yard under him.[1]

2. SAME—COMPETENCY TO RUN ENGINE.

Evidence that a yard master had occasionally run engines, and could handle them with perfect safety, is sufficient to establish his competency to run a switch engine in the switching yard, though he may never have passed the examination for engineers.

3. SAME.

That one handling a switching engine was reckless in a particular instance does not prove incompetency.

4. SAME—DERAILMENT—FAILURE OF YARD MASTER TO GIVE PROPER INSTRUCTIONS.

In an action for death by the derailment of a train, it appeared that there had been placed in the track an automatic switch, intended to be ordinarily set by hand, and depended upon as automatic only in emergency. The yard master in charge of the track informed the employés using the switch that it would work automatically at all times, and a train attempted to be run across the switch when not set was derailed, causing the death of an employé. Held, that the yard master's failure to communicate the proper use of the switch to the employés using it was a breach of duty for which the railroad company was liable.

Intervening Petition of Mary R. Gray, Administratrix of Fletcher B. Gray, Deceased.

Mary R. Gray, administratrix of Fletcher B. Gray, deceased, has filed her intervening petition seeking to recover damages from S. M. Felton, receiver, appointed under an order of this court herein, and engaged in the operation of the railroad of the Cincinnati, New Orleans & Texas Pacific Railway Company. Fletcher B. Gray was employed as a yard conductor or foreman of the switching gang in the yards of the receiver at Somerset, Ky., which is the north terminus of the Chattanooga Division of the railroad. The second amended petition avers that on March 26, 1893, complainant's decedent, while at work as defendant's employé in the capacity of foreman of the yard crew in the yard at Somerset, Ky., was killed by the derailment of a caboose, and its consequent collision with a box car on the side track of defendant's railway, which derailment and collision occurred without fault of the complainant's decedent, but was caused by the negligence of the said defendant, his agents and employés, in causing said caboose to be operated over a defective track, over a switch of dangerous and defective construction and condition.

---

[1] As to who are fellow servants, see notes to Railroad Co. v. Smith, 8 C. C. A. 668, Railway Co. v. Johnston, 9 C. C. A. 596, and Flippin v. Kimball, 31 C. C. A. 286.

and by a careless and incompetent yard master of said defendant, by whose negligence the caboose was propelled at a dangerously high rate of speed over said defective track; that the defendant knew, or could by the use of ordinary care have known, of said defective condition of the track, and of the unfitness and incompetency of said yard master, and of which complainant's decedent did not know, nor could, by the exercise of ordinary care, have known. The receiver, in his answer, denied that the track was defective, that the switch was of a dangerous construction, that the yard master was careless or incompetent, or that the accident occurred by reason either of such track, such switch, such incompetent yard master, or because of the high rate of speed at which the train was going. The issue was referred to a master, who has found the facts:

"The decedent, Fletcher B. Gray, was yard foreman in the Somerset yards. Fred Cook was the general yard master of the Somerset yards. On March 26, 1893, the yard was crowded with cars. The engineer of one of the switch engines—Stokes—had gone home to his dinner. The yard master, Cook, being anxious to expedite the work, took charge as engineer of the switch engine during the absence of Stokes, and began doing work with it in the yards. The decedent, Gray, yard foreman, was assisting him in this work. One Garrett was acting as fireman on this switch engine with Cook. George T. Moon, who was then a freight conductor, and one Melville Ramsey, who was then a switchman of the Southern, were assisting in this work. The switch engine came from the north part of the Somerset yards to a point below the yard office, backing down, pushing one caboose and pulling two. The train was going at a rate of speed variously estimated by witnesses both for plaintiff and defendant at from 15 to 25 miles per hour. While going at this rate of speed, said Moon, Fletcher B. Gray, and said Ramsey were standing on the south end of the caboose, which was being pushed south by the engine over the main track, it being the caboose of said Moon, the freight conductor. Several days before the day of the accident, which occurred Sunday, there had been put in the yard two automatic switches. These switches were called automatic, not because they were expected at all times to work automatically, without being thrown by a switchman or employé of the road, but they were useful in cases of emergency or accident, and, in the event of a car or engine accidentally running into said switch, it was expected that the switch would throw itself, and thereby prevent a derailment, or damage to the switch or track. They were not switches either new or novel in construction, although they were never before in that yard, but switches which had been in use on other roads for years past, and were known to be good standard switches. This switch, it was intended, should be handled by the switchman as other switches were. It was not a labor-saving device in the sense that it did not have to be moved by a switchman, but it was intended to prevent derailments in case the switch was misplaced. Mr. Felton, the receiver, states that they were never intended to be used automatically in regular service. It was only in case of emergency that the automatic switches were expected to be brought into play at all. While this train of which the yard master was acting as engineer was thus proceeding southwardly along the main track, this automatic switch was set so that, if it did not work automatically, or was not thrown by a switchman, the train would continue, not along the main track, but would be switched off on a side track to the left (that is, the east side of the main track), where, a few feet distant from the switch, other cars were standing. The train, without slacking speed, ran into this switch, and immediately the caboose left the track, and collided with the cars on the side track, killing Gray, and causing a wreck of the engine, of the caboose it was pushing, and of the two cabooses the engine was pulling. * * * The evidence clearly shows, as heretofore stated, that the switch was intended to act automatically only in case of emergency. Although it had not been oiled, I believe it was in such condition that there would have been no difficulty for any employé or servant of defendant to throw the switch. It is also probable that the switch might have thrown itself, provided the cars had not been running at such high rate of speed; but, going at such high rate of speed and with a caboose in front, which is many tons lighter than an engine, I believe the switch would not have thrown itself, whether oiled or not. The switch

was not intended to be run through in this manner, oiled or not oiled, and I cannot conclude from the evidence that the switch would, under the circumstances, have worked automatically, and thrown itself, even if oiled. The negligence, therefore, if any, consists not in failing to oil the switch, but in using it in a way for which it was not intended. It is contended in behalf of plaintiff that the men in the yard were informed by the yard master, Cook, that this automatic switch did not have to be thrown by the men, but that the trains or cars themselves would throw the switch, and that during the two or three days that the switch was in operation the men so believed, and acted on that belief; and from all the evidence on this point I am clearly of the opinion that Cook, the yard master, did not only believe that the switches were intended to be used without having the men themselves throw them, but that he did so use the switches, and informed the men under his charge that they were to be so used, himself setting them the example. Therefore, as I view the case, the whole question of the liability of defendant is determined by the fact of whether or not Cook, the yard master, was a fellow servant of Gray, the decedent. The evidence discloses that Somerset was what is known as a 'division terminal.' It is the half-way point between Cincinnati and Chattanooga, and it is at this point where trains are made up to go both north and south. The yards are shown by the evidence to be very large. One of the witnesses testifies that 15 or 20 miles an hour, the rate at which this train was going, was not too high rate of speed, 'as they were going from the north to the south end of the yard which was 'something like half a mile.' It was over these large division terminal yards that Cook was general yard master. As to the power and authority given to and exercised by him in this capacity, Mr. Felton testified: 'Q. You spoke of the yard master as one of the officers of the company, classing him with the superintendent, and I forget what other officer. Over what employés has he authority as an officer of the company? A. The yard master has charge of the yard and the yard crews and the train crews, while in the yard limits. He has entire charge of the operating of the yard.' The rules of the company in force at the time of the accident relating to the yard master's duties were as follows: By rule 134, as yard master, Cook had charge of the yards where the trains are made up, the movements of trains therein, and the force employed. By rule 135 the yard masters are responsible for the prompt transportation of cars, and the prompt movement of all cars within the limits of their yards. They must be familiar with the rules of the freight service, and with the duties of every employé connected with freight trains, and will require the prompt and efficient discharge of those duties in the yards. By rule 139 they must not permit a train to start with an engineman, conductor, or brakeman who is under the influence of liquor, or unfit for duty. By rule 142 they must see that their cars are kept in good order, that cars are properly inspected, and that those requiring repairs are sent to the shop. One of the defendant's witnesses (Moon) tersely states the duties of the yard master as follows: 'All in the yard is subject to his orders.' Considerable testimony was taken on the question as to whether or not Yard Master Cook, while acting as engineer, ought to obey signals such as decedent, Gray, might have given him while running the train. All this, however, I think is immaterial. Of course, such signals as to go ahead, or to back up, or to go slow, and the like, would have to be given by the foreman, brakeman, or any other person on the train to the engineer operating the train; but this does not mean that the yard master is in any respect whatever deprived of that power and authority which he possesses as yard master. He is none the less yard master, with all the powers and duties of the office, whatever work he may temporarily assist in doing. * * * Believing, therefore, it is clear that Yard Master Cook is a vice principal of the company, and that he did not to any extent whatever lose that character while acting as engineer, it becomes necessary to ascertain whether Gray met his death through either the negligence, incompetency, or unskillfulness of said Cook, and, if he did, the defendant company should be held liable. In the first place, Cook should not have taken charge of the engine. While there is some conflict in the testimony as to his capacity to run an engine, the statement of Mr. Griggs, the superintendent, is that he has never passed the examination which was required for an engineer; that he

(Mr. Griggs) had seen him move engines occasionally; and that he thought he might handle an engine in the yards, but that the yard master had no authority to handle an engine. The present yard master, Jones, witness for defendant, testified that Cook could handle an engine with perfect safety; but Whitely, for plaintiff, testified that he had known Cook intimately for 16 years, and had never known him to run an engine. Moon (defendant's witness) had known Cook since 1886, and during all that time he had not, to Moon's knowledge, had any experience as an engineer. Vickey, plaintiff's witness, testified that he had known Cook intimately for 13 years; that, if he had any experience as an engineer, he did not know of it, but that he had seen him use an engine a few times, when the engineer was absent, without an accident. Cook, whose testimony was taken in Mexico by defendant, no one being present for plaintiff, testified that he had become familiar with the operation of locomotives from his twenty-two years of railroad experience, and had handled them quite often. He did not state that he was a skilled or competent engineer, or that he had ever passed an examination as engineer, or that he had ever regularly run an engine. Upon such state of fact, Cook had no right whatever to take charge of and run the switch engine, either during the absence of the regular engineer at dinner, or at any time whatever. The fact that the yards were crowded, and time was pressing, affords no reason why an incompetent person should run the engine. There can be no question but that, had Cook, by reason of his authority as yard master, employed a man to run this switch engine, who had never taken the course which engineers take, and had never passed the necessary examination, the defendant would be liable for any damage occasioned by such person's negligence or incompetency. Such being the case, the defendant is liable, if Cook, having such authority and power to employ an engineer, himself took charge of the engine. Further, Cook's conduct was in direct violation of rule 342 of defendant, in force at that time, which is as follows: 'It is the duty of the engineman to handle his own engine at all times, but the fireman may do so at the station, in the immediate presence of the engineman, or when, by necessity, the engineman is temporarily absent: provided, the master mechanic has declared him competent.' Further, as heretofore stated, it was made the duty of the yard master, under rule 345, to be familiar with the duties of every employé connected with the freight trains, and it was his duty to enforce obedience to these rules. Although the testimony of Mr. Felton, Mr. Griggs, and others leaves no question as to the manner in which these automatic switches were to be used, it is clearly evident that Cook did not use this switch properly during the several days it was put in, but that he informed the men in the yards that it was to be used in a manner never intended, giving them to understand that it did not have to be thrown by a switchman or employé, but that the cars themselves would throw it, it being intended to work automatically; and there is no doubt that several times the switch had worked without any one throwing it. * * * Gray's statement to Moon shows that he had been so informed, and, further, he acted on that information, and so lost his life, though he endeavored to slow up the train because of its high rate of speed. It is further clear beyond all doubt that Cook at the time of the accident did attempt to run through the switch at a high rate of speed, knowing it was set wrong. George T. Moon, also on the platform, one of defendant's witnesses, stated that he did not see Gray give any signal, but when he (Moon) told Gray that the switch was open, he answered, 'That's all right,' leaving the impression on his mind, as he stated, that the switch was safe, and would throw itself. * * * It was certainly gross carelessness and incompetency to run at such rate of speed knowing the switch was wrongly set. It seems from other testimony that the switch had set itself on several other occasions, and I have no doubt but that Cook believed it would do so when he ran over it. * * * If Cook, with his power and authority, and the duty he owed defendant's servants, was ignorant of the manner in which the switch should be used, it is an ignorance for which the company should be held liable. The entire operation of the yards was in the charge of Cook. Instructions and orders to the men employed in the yards came from him. If, therefore, he put in appliances, and wrongfully informed the employés of the defendant as to the manner in which they should be used,.

and these employés, using such appliances as directed, are injured, the defendant is certainly liable. In this case the yard master himself, by his ignorance of the proper use of the switch, or his negligence, caused Gray's death, and, in either event, defendant is liable."

C. M. Cist, for plaintiff.

Harmon, Colston, Goldsmith & Hoadley, for defendant.

TAFT, Circuit Judge (after stating the facts as above). The charges of negligence contained in the second amended petition are: First, that the receiver permitted the operation of the caboose over a defective track, and, secondly, over a switch in a dangerous and defective construction; third, that the accident occurred through the negligence of the yard master of the defendant in the operation of the locomotive, the yard master being a vice principal, and representing the receiver; fourth, that the yard master, even if a fellow servant, was incompetent, and unfit, that the receiver was aware of his unfitness and incompetence, and that this caused the accident. There is no evidence to show that the track was defective. There is no evidence to show that the switch was of a dangerous construction and condition. There is evidence to show that the switch was not sufficiently oiled, but the master finds, and the evidence supports him in the view, that, even if the switch had been oiled, the accident would have happened. From this it follows, of course, that the injury was not caused by the failure to oil. Third, it is said that the accident was caused by the negligence of the yard master, and that he was a vice principal, and represented the defendant in what he did. The master found that the yard master was a vice principal. I cannot agree in this conclusion. It is true that the evidence shows that the yard master had complete control of the yard; he was made responsible for its condition; that he was authorized to employ and discharge men, and that he directed the incoming and starting of trains. I do not think, however, that under the principles laid down in the Baugh Case, 13 Sup. Ct. 914, this would put him at the head of one of the departments of the railroad. The nature of his duties was not at all unlike that of a station agent, only that he had more men under him. He was subject to the orders of the superintendent, whose office was at the station in Somerset. He was subordinate to the train master. It would serve no good purpose to discuss at length or restate the grounds of the rule which must control the federal courts in determining the question whether an employé is a fellow servant or not. They have been laid down with elaboration in the Baugh Case, already referred to, and have been reaffirmed from time to time by the supreme court in numerous cases. Railroad Co. v. Keegan, 160 U. S. 259, 16 Sup. Ct. 269; Railroad Co. v. Peterson, 162 U. S. 346, 16 Sup. Ct. 843; Oakes v. Mase, 165 U. S. 363, 17 Sup. Ct. 345; Railroad Co. v. Poirier, 167 U. S. 48, 17 Sup. Ct. 741; Mining Co. v. Whelan, 168 U. S. 86, 18 Sup. Ct. 40. In Grady v. Railway Co., 34 C. C. A. 494, 92 Fed. 491, decided by the court of appeals of this circuit March 7, 1899, it was held that the foreman in charge of the freight-car repair shops, the immediate subordinate of the

master car builder, who had control of the work of car repairs,—a branch of the mechanical department of the road, at the head of which was the master mechanic,—was a fellow servant of the workman who, it was charged, was injured through his negligence. In that case the court said:

"The Baugh Case has set such limits to the vice-principal doctrine that it is exceedingly difficult to suggest a position outside of those of the superintendents or acting superintendents of the various great departments of the road, the incumbent of which is not to be regarded as a fellow servant of all the other employés. The Ross Case, 112 U. S. 377, 5 Sup. Ct. 184, it is said, has never been expressly overruled. This is true, but it has been so limited to its peculiar facts as to make it of no force as authority in any case where those facts are not exactly presented."

The exception to the finding of the master that Cook was not a fellow servant of Gray is sustained.

The next charge of negligence is based on the employment of Cook as a yard master when he was known to be incompetent. There is not the slightest evidence that Cook was not a good yard master. But it is said that he was an incompetent engineer. It is sufficient answer to say that he was not employed as engineer, and, if he discharged duties not assigned to him, the company is not responsible for this breach of duty unless he was a vice principal, —as he was not. But the argument is, and it is supported by the conclusion of the master, that Cook had authority to employ engineers, and in doing so he was discharging a personal duty of the receiver, owing to Gray, to use due care in the selection of such engineer; that when he assumed to act as engineer he was employing himself; that he knew he was incompetent, and, as he represented the company in the act of employing, the company was responsible for the result of such employment. The first objection to this position is that there is no allegation in the petition under which it can be maintained, and the second is that the evidence does not sustain the conclusion that Cook was not competent to run an engine in the yards. I have read the evidence on the question of the competency of the yard master both as a yard master and as an engineer, and I do not think that it established that he did not have sufficient knowledge to run a switch engine in the switching yard. He was undoubtedly reckless in the case before us, but a single instance of recklessness does not prove incompetency. The evidence to prove his incompetency is of a negative character, and most unsatisfactory, and it does not, it seems to me, contradict in any material way the direct and affirmative evidence that he did not know enough about an engine to run it in the yards. The exceptions to the finding of the master on these charges of negligence are sustained.

I think, however, that there is another ground of negligence clearly established by the evidence, which the court, in order to do justice, ought not to ignore, and ought to give the petitioner an opportunity to introduce into her petition by amendment. The evidence and the findings of the master make it clear that the real reason for this accident is to be found in an attempt of the yard master,

and the acquiescence of the other employés who were with him in that attempt, to run through an open switch on the supposition that the switch was intended to work automatically at all times, and to save the necessity of turning it by hand. It is further clearly shown by the evidence for the receiver that the switch had not such purpose. The switch was placed where it was with the hope that in cases of accident when cars ran through an open switch the breaking of the switch points would be avoided by automatic action in the switch itself. It was not intended that employés should deliberately run through an open switch, relying on the operation of the automatic device. It was not a labor saving machine. It was only to be used in an emergency. It was like an emergency brake in an elevator, or a device for breaking the fall of the cab at the bottom of the elevator in case the cable breaks. Such devices are not intended for constant use, and a servant who puts them to such use cannot complain if they do not always operate. They are safety appliances to be used in case of accident, and cannot be relied on in the regular course. It was a personal duty of the company to plaintiff's decedent, as one of its employés, to communicate to him and to all other employés using the switch the proper limitation upon its use. This was not done. Had the yard master been informed that the automatic device in the switch was only to be depended upon when it could not be helped, but that in all ordinary circumstances it was to be used as an ordinary hand switch, and had he communicated these rules for the use of the switch to his subordinates, it is clear that this accident would not have happened. Gray, standing upon the front platform of the caboose, seeing the open switch, would undoubtedly have signaled to Cook, who was running the engine, to stop until the switch could be turned. Cook would have stopped, and in that case there would have been no collision. It is a personal duty owing by the master to the servant in a dangerous and complicated business to prescribe rules sufficient for its orderly and safe management, and to keep his servants informed of those rules, so far as they may be needful for their guidance. Railroad Co. v. Camp, 31 U. S. App. 213, 13 C. C. A. 233, and 65 Fed. 952; Slater v. Jewett, 85 N. Y. 61; Shear. & R. Neg. (5th Ed.) § 202. It is further the personal duty of the master to avoid exposing his servants to unusual risks by giving warning to them of the perils to which they may be exposed in the use of machinery, where the servant has not the same opportunity to know the dangers of the machinery that the master has. In the present case this switch had been put in place but a few days before, and the scope for its use had certainly not been properly explained to its employés. They had been given to understand by the yard master that it was a labor-saving device, instead of which it was only an emergency switch. To this failure on the part of the receiver or his superintendent the accident is directly due. It would properly have been the yard master's duty to communicate to the employés the proper use to which the automatic part of this switch could be devoted. If he failed in that duty, he failed in a personal duty directly owing from the receiver to petitioner's decedent, for

which the receiver can be held liable. It is not that the switch was defective, but only that its mode of use, resulting from a failure of the receiver or his agents properly to regulate it, was negligent. In Smith v. Baker [1891] App. Cas. 325, the plaintiff was employed to drill holes in a rock near a crane worked by men in another department of his employer's work. The crane was used for lifting stones which were sometimes swung over plaintiff's head without warning. During the work a stone so swung fell on the plaintiff, and injured him. This was held by the house of lords to be a defective system of work, rendering the employer liable in the event of injury caused thereby. "I think," said Lord Halsbury (page 339), "the cases cited at your lordships' bar of Sword v. Cameron, 1 Sc. Sess. Cas. (2d Ser.) 493, and Coal Co. v. McGuire, 3 Macq. 300, established conclusively the point for which they were cited,—that a negligent system or a negligent mode of using perfectly sound machinery may make the employer liable."

The remaining exceptions to the report are overruled. The petitioner is given leave to file an amendment to her amended petition in accordance with the suggestion herein, and upon the filing of such amendment a decree will be entered finding in favor of the petitioner in the amount reported by the master, to wit, $8,000.