# Richmond.

HALEY, CHISHOLM & MORRIS v. TRICE'S ADMINISTRATRIX.

March 16, 1916.

1. MASTER AND SERVANT—*Injury of Servant—Negligence of Servant—Backing Engine—Excessive Speed—Lookout—Case at Bar.*—Where the engineer of a dinky engine used in railroad construction work, operating under a rule of the contractors which required him to keep a lookout and to approach the steam shovel with his train under control, repeatedly admitted that a personal injury inflicted upon him by reason of his train backing into a steam shovel was occasioned by his own fault in running his train too fast, and in not keeping any lookout whatever when a single glance would have shown the obstruction on the track and the warning signals attempted to be given him, he cannot recover damages of the contractors for the injury he sustained. There was a continuing duty on the engineer to keep a lookout, at least from time to time, in the direction in which he was going, and the failure to observe it was negligence on his part which bars his recovery. Under the evidence, in the case at bar, it was error to add to an instruction embodying the above statement, "provided they believe from the evidence that the exercise of ordinary care for his own safety required that Trice (the engineer) should look ahead to observe whether there was any obstruction on the track."

2. MASTER AND SERVANT—*Injury of Servant—Negligence of Boss of Gang.*—The mere execution of planned work must be entrusted to workmen, and at times to groups or gangs of workmen, and in the latter case it is necessary that one should be selected as the leader, boss or foreman, to see to the execution of such work. This sort of superiority is so essential and so universal that every workman, in entering upon a contract of service, must contemplate its being made use of in a proper case. He, therefore, makes his contract of service in contemplation of the risk of injury from the negligence of a boss or foreman as well as from the negligence of another fellow workman. The mistake, or negligence, of such a boss or foreman, in the administration of the work, is the act of a fellow servant.

Error to a judgment of the Circuit Court of Prince George county in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*D. Lawrence Groner,* for the plaintiffs in error.

*O'Flaherty, Fulton & Byrd,* for the defendant in error.

HARRISON, J., delivered the opinion of the court.

This action was brought by J. F. Trice to recover of the plaintiffs in error damages for personal injuries alleged to have been caused by their negligence. The plaintiff died before the trial, and the suit was revived and has been since prosecuted in the name of the defendant in error as his administratrix. Upon the trial there was a verdict and judgment in favor of the plaintiff, which we are asked to review and reverse.

It appears from the record that the defendants were railroad builders and contractors, engaged at the time of the accident in double tracking a section of the Norfolk and Western Railroad in Prince George county. In the prosecution of this work they used steam shovels, dinky engines, dump cars and other similar appliances. Trice, the plaintiff's intestate, had been for some time prior to the accident an engineer running one of the dinky engines used in the work. On the morning of the accident he was directed by Harris, the dump foreman, to couple his engine to another dinky engine, which was in turn coupled to some twenty-four dump cars, and to take the cars in a westwardly direction, so that the last car of the train would be opposite the steam shovel. This movement necessitated the running of his engine backward. The day was clear, the track was straight, the land was level, and there were no obstructions to the view in the direction in which he was going. In order to

jack up the end of a section of the track so that the steam shovel could be operated, the shovel had been backed so that it extended temporarily over the dinky track. As soon as the dinky train started back, Payne, who was in charge of the steam shovel, ran out and began signaling to Trice to stop. The undisputed evidence is that Trice was standing in his cab with his back in the direction in which he was going, and that he did not once turn to see if anything was in the way ahead of him. His explanation is that he was engaged in looking at signals from Harris, the dump foreman. As he did not once look in the direction he was going, he did not see the signals that Payne was giving to warn him of the situation of the steam shovel until it was too late for him to stop, and his engine collided with the steam shovel, resulting in the injuries complained of.

In the deposition of Trice, which was read on the trial, he says that in moving his engine at the time, he was acting upon the *"high-ball"* signal, which meant that "he was to go as fast as he could." "Run pretty fast, I thought, that is what I was doing." The uncontradicted evidence shows that the plaintiff's intestate repeatedly admitted that no one but himself was at fault or responsible for the accident; that it resulted from his running too fast and from his failure to look back in the direction he was going. Stilwell, the engineer on the other dinky which was attached to the train, a witness for the plaintiff, was asked on cross-examination if the deceased stated whose fault it was that the accident happened. His reply was, "I said, 'Mr. Trice, I am sorry to see you in this shape;' and he said, 'Yes, I can't blame anybody but myself. I was running too fast, and if ever I run another dinky I will not run it that fast, and I can't blame anybody in God's world but myself.'" This conversation occurred on the day of the accident. Dr. Terrell, his family physician, who attended the deceased after he had been taken to his home in Louisa county, was asked, "Did he make any statement about how it occurred, as to whose fault it was?" and he replied, "Yes, sir; I went in and told him I was very

sorry to see him in that condition, and asked how in the world it happened, and he said it was altogether from running too fast, and he went on to say that he was running as fast as any lightning express ever ran over the C. & O. road." The doctor further says that his mental condition was all right and that he knew what he was saying. E. H. Poindexter, a merchant who lived at Frederick Hall, says that he saw the deceased after he was brought home and he said that "the accident was caused through recklessness." N. T. Payne, who had charge of the steam shovel and saw the deceased at the time of the accident, was asked, "What did he say about the blame for the accident?" and replied, "Every time I would leave he would call me, and I would go back, and sat down and talked to him, and I said, 'Mr. Trice, I am mighty sorry to see you in this condition,' and he said, 'Yes, it is mighty bad; I can't blame anybody but myself; I ought to have been looking where I was going.' " This witness further states that his mind was all right.

J. B. Shelton, who was the steam shovel cranesman at the time of the accident, was asked the following questions:

"Q. What did you hear him say, if anything, as to how this accident occurred, and who was to blame for it? A. I heard him say that he did not blame anybody for the accident but himself."

"Q. Did you hear him make any explanation as to how it occurred? A. I heard him say that he was running too fast, he thought, and had been running his engine too fast the last two or three days since he had been on the good track."

"Q. Did he say anything about whether he was keeping a lookout or not? A. I heard him say that he was looking the other way, and not looking the way that he was going."

A. S. Ayers, one of the employees of the defendants, who had a conversation with the deceased the next morning after the accident, was asked, "How did he state to you it occurred?" and replied, "I went to see him next morning and asked him how in the world did this occur right on a dead straight track,

and you could see, sitting on the engine, right straight up the line—how did this occur anyhow? He says, 'Mr. Ayers, it was nothing but our own fault, carelessness ourselves that caused this trouble. I don't blame anybody but myself. We were not looking at what we were doing."

F. H. Sharp, an employee of the defendants who had a conversation with the deceased on the day of the accident, was asked, "Did he make any statement as to how this accident occurred?" and said: "I asked Mr. Trice how in the world the accident occurred. Mr. Trice told me that he did not blame anybody but himself. He says, 'I was running my engine too fast.' He said, 'If I ever get up again, and get on an engine again, I will never run in the same speed I did this time.'" This witness in answer to a further question, said: "He said he was not looking where he was going. He said he did not expect anything ahead of him, and was not looking in the direction in which he was going."

A. T. Goodwin, an employee, who went with the deceased to his home in Louisa, says that before he left the camp he asked the deceased how it happened, and he said "he was running too fast, and was not looking where he was going, and ran into the shovel without looking where he was going at all." This witness further says that he repeated the foregoing statement to the same effect on the train going home and also at Frederick Hall after he was taken off the train.

These repeated admissions by the plaintiff's intestate, that no one was to blame for his injuries but himself, and that such injuries were the result of his own negligence in running his engine too fast, and in not looking where he was going, are not denied, °and there is no evidence in conflict with them. The plaintiff's intestate, in his deposition, after stating that Harris, the dump foreman, had given him the "high-ball signal," which meant to go as fast as he could, says that he was going backward and consequently riding with his back toward the steam shovel, and that Harris was giving him a signal all the way

from the place of starting until he hit the shovel, and that he was looking at Harris in order to take the signal. This statement does not conflict with the repeated admissions of the deceased as to his responsibility for the accident. He may have been looking at Harris for the purpose of taking signals, and still have been culpable in not glancing once in the direction in which he was backing his engine, to see if any obstruction was in his way, especially in view of the rule under which he was operating which required him to keep a lookout and to approach the shovel with his train under control. The evidence is that one glance in the direction in which he was going would have been sufficient to reveal the obstruction of the steam shovel on the track and the vigorous signals that were being given him to stop. We think that the admissions of the deceased clearly recognize that notwithstanding his taking a signal from Harris, he was at fault in not turning his head once to see where he was going, and thereby to have avoided the accident which resulted in his injury.

Instruction "A," offered by the defendants, told the jury that if they believed from the evidence that by looking ahead, either at the time he started, or immediately afterward, Trice might have seen the steam shovel extending over his track, or the signal to stop, and have avoided the accident, such failure on his part to look was negligence precluding a recovery. To this instruction the court added these words: "Provided they believe from the evidence that the exercise of ordinary care for his own safety required that Trice should look ahead to observe whether there was any obstruction on the track."

The theory of this instruction, as well as that of instructions "B" and "C" asked for by the defendants, which were also amended, was that there is a continuing duty on the part of an engineer of a steam engine hauling a train of cars over a track, at least from time to time to look in the direction in which he is going, and that this is a positive duty, the failure to observe which is negligence. We are of opinion that, under the facts

and circumstances presented by the record, these three instruc-
tions correctly propounded the law, and should have been given
without amendment and in the form in which they were asked,
especially in view of the repeated admissions of the deceased
that his injuries were the result of his own fault in not looking
in the direction in which he was going.

The defendants' instruction "H" told the jury that in giving
signals, Harris, the dump foreman, was the fellow servant of
Trice, and instruction "J," asked for by the defendants, told
the jury that Payne, the steam shovel foreman, in backing the
shovel across the track, was the fellow servant of Trice. Both
of these instructions were refused.

The action of the court in refusing these instructions was
plainly erroneous. The duties of these two men were not such
as to elevate them from the position of mere bosses of their re-
spective gangs of laborers. The duties of Harris were to super-
vise the work at the dump. When the train of cars was brought
to the dump by Trice, he would direct how the dumping should
be done, and where it should be done, and when it was done
direct the return of the train for another load; while Payne,
who had charge of the steam shovel and the loading of the cars,
directed the engineer as to the placing of them and the time of
taking them away when loaded. Between the dump and the
steam shovel, the engine and the train were in charge of the
engineer. The record shows that the defendants had dis-
charged their duty with regard to place, appliances, rules and
fellow servants. The details of the work and the manner of
the use of the instrumentalities were committed, as in the nature
of things was necessary, to the employees. Under the circum-
stances disclosed by this record, neither Harris nor Payne occu-
pied the relation to Trice of vice-principal. A mistake of one
of such employees, even though the boss of a gang, in the ad-
ministration of the work, is the act of a fellow servant. *Rich-
mond Locomotive Works* v. *Ford*, 94 Va. 642, 27 S. E. 509;
*N. & W. Ry. Co.* v. *Houchins*, 95 Va. 404, 28 S. E. 578, 46 L.
R. A. 359, 64 Am. St. Rep. 791; *Moore Lime Co.* v.

*Richardson,* 95 Va. 326, 28 S. E. 334, 64 Am. St. Rep. 785; *Southern Ry. Co.* v. *Smith,* 107 Va. 553, 59 S. E. 372; *Coyne* v. *Union Pacific,* 133 U. S. 370, 10 Sup. Ct. 382, 33 L. Ed. 651; *B. & O. Ry. Co.* v. *Baugh,* 149 U. S. 368, 13 Sup. Ct. 914, 37 L. Ed. 772; *Central R. Co.* v. *Keegan,* 160 U. S. 263, 16 Sup. Ct. 269, 40 L. Ed. 418.

In the last-named case the law is satisfactorily stated as follows: "Whether the master retains the superintendence and management of his business, or withdraws himself from it and devolves it on a vice-principal or representative, it is quite apparent that, although the master or representative may devise the plans, engage the workman, provide the machinery and tools, and direct the performance of the work, neither can, as a general rule, be continually present at the execution of all such work. It is the necessary consequence that the mere execution of the planned work must be entrusted to workmen, and where necessary to groups or gangs of workmen, and in such case that one should be selected as the leader, boss or foreman to see to the execution of such work. This sort of superiority of service is so essential and so universal that every workman, in entering upon a contract of service, must contemplate its being made use of in a proper case. He, therefore, makes his contract of service in contemplation of the risk of injury from the negligence of a boss or foreman as well as from the negligence of another fellow workman. The foreman or superior servant stands to him, in that respect, in the precise position of his other fellow servants."

We are further of opinion that it is clear that the motion to set aside the verdict and grant a new trial upon the ground that the same was contrary to the law and the evidence, should have prevailed.

For these reasons, the judgment complained of must be reversed, the verdict of the jury set aside and a new trial had, if the plaintiff be so advised, not in conflict with the views expressed in this opinion.

*Reversed.*