### CHICAGO HOUSE WRECKING CO. v. BIRNEY.

(Circuit Court of Appeals, Eighth Circuit. May 12, 1902.)

No. 1,649.

1. MASTER AND SERVANT—ACTION FOR INJURY OF SERVANT—QUESTION OF FACT AS TO POWERS OF SUPERINTENDENT.

Defendant, a wrecking company incorporated in Illinois, was engaged in tearing down the buildings used during the exposition at Omaha. There was evidence tending to show that one B., during several months while the work was in progress, performed the actual duty of superintendence,—hiring and discharging men, and directing the foremen of the several gangs as to their work,—although the treasurer of the company remained in Omaha during most of the time, and had full power to represent the company in all matters. Plaintiff, who was a workman employed by defendant in the work, was injured through obeying a negligent order given by B. Defendant introduced evidence that B. had

no independent power of superintendence, but was only an intermediary through whom its treasurer, who was superintending the work, communicated his orders, and executed his powers, and occupied the same position toward the company and its employés as other foremen. *Held*, that the question whether B. was in fact vested with and exercised the powers of a general superintendent over the work was one for the jury.

**2. SAME—VICE PRINCIPAL—HEAD OF DEPARTMENT.**

A wrecking company which had purchased all the buildings used for an exposition which covered many acres of ground, and was engaged in tearing the same down, and selling the materials, placed a general superintendent, who was a skilled engineer, in charge of the work of tearing down the buildings, in which a force of from 150 to 300 men were engaged for six months. The superintendent hired and discharged men, and was constantly on the ground, personally directing the foremen of the different gangs and the general course of the work. The selling of the materials was in charge of different men. *Held*, that the tearing down of the buildings was a separate department of the company's business, and that the superintendent in his relation to the men employed in such work was not a fellow servant, but a vice principal, for whose action in giving a negligent order to a workman, in relation to his work, which resulted in the latter's injury, the company was liable.

**3. SAME—DAMAGES FOR PERMANENT INJURY—INSTRUCTION.**

A court in charging the jury as to the damages recoverable, in an action for a personal injury which the evidence tended to show was permanent in character, instructed that it would not be proper to multiply the amount of plaintiff's annual earnings by his expectancy of life, and reach a result in that way, but that it was the province of the jury "to ascertain by the exercise of a sound judgment what would be the present cash value of his earnings, considering his expectancy of life." Further on, the court stated: "Sometimes it has been said that it is such a sum which, if put at interest, would earn annually the amount of money which the testimony may show he might earn, * * * or did earn; but this is not conclusive upon the jury; it all finally comes back to your sound judgment and discretion, * * * to fix the amount in your sound discretion, governed by the rules which I have stated." *Held*, that such charge, considered as a whole, was not erroneous as imposing upon the jury an incorrect measure of damages.

Sanborn, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Nebraska.

W. D. McHugh and Isaac R. Andrews (J. M. Woolworth, on the brief), for plaintiff in error.

Charles J. Greene (Ralph W. Breckenridge, Howard H. Baldrige, and Richard S. Norval, on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge. This is an action for personal injuries which Otto C. Birney, the plaintiff below and the defendant in error here, sustained while he was in the service of the Chicago House Wrecking Company, the plaintiff in error, and was assisting in the tearing down and removal of the large exposition buildings at Omaha, Neb. The negligence complained of was an order given by W. G. Bennett, a person in the service of the Chicago House Wrecking Company (hereafter termed the "Wrecking Company"), which order exposed the plaintiff to great peril, and in the execution of which

he was injured in a manner and to an extent that has probably disabled him for life from pursuing his ordinary avocation. It is conceded that the order given by Bennett was, under the circumstances, a negligent order, or, if this concession is not made in terms, it is at least admitted that there was evidence which warranted the jury in finding that it was negligent, and in finding that the plaintiff was in no wise at fault for obeying it, or in the manner of executing it. As the case hinges entirely on the questions whether Bennett was one of those persons for whose action in giving the order the wrecking company was responsible, or whether there was evidence from which a jury could properly find that he occupied a relation to the company which renders it responsible for the order, it is unnecessary to state the circumstances under which the injuries were received with much detail. It will suffice to say generally that the evidence shows substantially the following facts: That on the day of the accident a portion of the liberal arts building was being demolished; that the plaintiff had been at work in that building for about half an hour, in tearing up the floor of an upper gallery, when he was commanded by Bennett to go to a certain upright post on the outside of the building, and tie a rope thereto, to enable other persons, who were on the outside, to pull the upright down; that a crossbeam or girder rested in a notch or shoulder of this upright, which was liable to become detached, and to fall by any swaying of that part of the building; that, to reach the place where the rope was to be tied to the upright, the plaintiff was compelled to walk across flooring joists from which the floor had been removed, and, while doing so, to look downward, and be very careful of his footing; that he was unaware that the crossbeam over his head was liable to slip and fall, which fact was known, or ought to have been known, to Bennett; and that, while he was tying the rope, the crossbeam fell because of the swaying of the building, upon which men were pulling from the outside with ropes, and, as it fell, struck the plaintiff, and precipitated him to the ground, a distance of 20 feet or more, which fall produced concussion of the brain, and partially paralyzed the plaintiff, and rendered him wholly unconscious for something over a week, until a surgical operation was performed.

The facts which are pertinent to a decision of the questions above stated are as follows: The plaintiff introduced testimony showing that the wrecking company was an Illinois corporation having its chief office in Chicago, and that it was engaged, on a large scale, in the business of wrecking buildings in various parts of the country, and marketing the materials. The corporation was composed principally, if not entirely, of two brothers by the name of Harris, one of whom, Frank Harris, was termed its treasurer, and had full authority to represent the corporation, and exercise its corporate powers, with reference to the enterprise in which it was engaged, at the time of the accident, in the city of Omaha. He made the contract with the exposition company for the purchase of its buildings, and took possession of them immediately after the exposition closed. The buildings thus bought covered a large tract of land more than 100 acres in extent; some, if not all, of them being very large structures.

The work of dismantling them occupied six months, during which period from 150 to 300 men were employed by the wrecking company. The men so employed worked in gangs numbering from 12 to 20 men each, and each gang had its separate foreman or boss. While the work of tearing down the buildings was under way, the grounds were frequented by many buyers, who went in and out of the buildings, selecting such lumber as they desired, and by wagons and cars. Many persons were also on the ground who were engaged in loading materials upon such vehicles. The work of demolishing such large structures, under the conditions last named, was dangerous, and of a character which required careful supervision by some one to prevent accidents. W. G. Bennett was an experienced bridge builder who had been in the wrecking company's service about eight years at the time of the accident, and had worked for it in various places. He was brought from Chicago to Omaha by the wrecking company to oversee and supervise the work of taking down and removing the exposition buildings. In that capacity he went from place to place on the grounds, in a buggy or on horse back, and exercised control over all the 15 or 20 foremen who were in the company's service, who were working in all parts of the ground. He hired and discharged men as they were needed; directed them where and how to work; and exercised such general control over the grounds, and all of the.work that was being done therein, save the sale of old material,—which labor was in charge of another person, by the name of Newman,—that he was regarded by the foremen and the laborers as the superintendent of the work of demolition, and his orders were respected accordingly. When Harris, the treasurer, was absent from Omaha, as he was for some days at a time during the progress of the work, the work did not stop, but proceeded, apparently, under the sole direction of Bennett, precisely as when Harris was in Omaha. Harris does not appear to have given orders and directions to the foremen and men who were actually engaged in demolishing the buildings, except on a few occasions.

The theory of the defendant company was, and it introduced considerable testimony in support of that theory, that Harris was its general superintendent; that Bennett exercised no independent functions as superintendent of the wrecking department; that he was merely the mouthpiece of Harris; that he reported to Harris daily, and received orders with respect to the number of men to be employed, the wages to be paid, the buildings to be wrecked, and the method of doing the work; and that he was in fact only an intermediary, through whom Harris, as superintendent, gave orders to his subordinates.

The power which Bennett actually wielded, for several months before the accident occurred, is certainly some evidence that he had been vested, by the corporation, with the power of superintendence which he visibly exercised. If he was allowed, for a considerable length of time, to exercise an authority which warranted the belief, on the part of those who worked under him, that he was the general superintendent of the work of demolition, as seems to have been the case, and if they were induced by that belief to respect his orders ac-

cordingly, the trial court was not required to accept, as conclusive, the statement of the defendant's witnesses to the effect that he was merely an intermediary through whom Harris, the real superintendent, communicated his orders, and that he occupied the same relation to the wrecking company and to the plaintiff as the other foremen. It was the province of the jury to say, in the light of all the evidence, whether Bennett was or was not the general superintendent of the work of demolition, and whether, in that respect, he exercised independent functions for and in behalf of the corporation. The position which he occupied cannot be said to have been made so entirely certain and clear, by the evidence, as to leave no reasonable ground for doubt or controversy. The trial court directed the jury to determine if "the * * * wrecking company had intrusted Bennett with the immediate supervision and control of the wrecking or tearing down of all the buildings owned by the defendant," and if "Bennett was in fact a general superintendent" of that work. We are of the opinion that there was no error in this direction, and that the testimony, considered as a whole, was of such a nature as entitled the jury to determine that issue.

In the same instruction to which reference was last made, the trial court further charged the jury that if they found that Bennett was the superintendent of the work of demolishing the buildings, and had been intrusted by the wrecking company with the immediate supervision of that work, then he was a vice principal, and his negligence was the negligence of the wrecking company. The verdict shows beyond peradventure that the jury did find that he occupied the position of superintendent of the work of tearing down the buildings, and that he had been intrusted with that duty, so that the further question to be determined is whether one who acts as general superintendent for a corporation in the execution of a work of such a character, and of such dimensions, as that heretofore described, occupies such a position as will render the corporation liable for a negligent order of the superintendent, in consequence of which another of its employés is injured.

It is conceded on all sides that a master may be liable to one of his servants for an injury sustained in consequence of the negligence of another person in his employ, on the ground that the latter person was a vice principal, although his negligent act was not done in the discharge of one of the personal duties of the master. Thus, in the celebrated case of Railroad v. Baugh, 149 U. S. 368, 383, 13 Sup. Ct. 914, 37 L. Ed. 772, it was conceded that where the business of the master is large and diversified, and has been separated into departments, the head of one of such departments, if he exercises full control over it, is the personal representative of the master, for whose negligent acts the master may be held liable. The same concession was made in other cases subsequently decided by that court, and in several cases that have since been decided by this court, in which we have endeavored to apply the doctrine of the Baugh Case. Railroad Co. v. Hambly, 154 U. S. 349, 359, 14 Sup. Ct. 983, 38 L. Ed. 1009; Railroad Co. v. Keegan, 160 U. S. 259, 264, 16 Sup. Ct. 269, 40 L. Ed. 418; Railroad Co. v. Peterson, 162 U. S. 346, 16 Sup. Ct.

843, 40 L. Ed. 994; Coal Co. v. Johnson, 6 C. C. A. 148, 56 Fed. 810; City of Minneapolis v. Lundin, 7 C. C. A. 344, 58 Fed. 525; Balch v. Haas, 20 C. C. A. 151, 156, 73 Fed. 974. It has always been found to be difficult, if not impossible, to describe a department in language which will fit all cases, and furnish a sure test by which to determine, in every instance, if the person in charge of what is claimed to be a department is so in fact, and for that reason is a vice principal, or is merely a fellow servant. Much depends, of course, upon the magnitude and character of the work that is done in that subdivision of the business which one has been appointed to superintend, and upon the further question whether the work is of such a nature as requires intelligent and careful·supervision on the part of the master. It is noteworthy that in the Baugh Case the supreme court did not, in terms, overrule its prior decision in Railroad Co. v. Ross, 112 U. S. 377, 5 Sup. Ct. 184, 28 L. Ed. 787 (although it has since done so), in so far as the latter case held that the conductor of a railway passenger train, who commands all of its movements, directs when it shall start, at what stations it shall stop, and who has the general management of it, and control over the persons employed thereon, is a vice principal of the company, for whose negligent acts it is responsible. In the Keegan Case, 160 U. S. 259, 264, 16 Sup. Ct. 269, 40 L. Ed. 418, the remark made concerning the doctrine of departmental control was, in substance, that while that court recognized that the head of a department might, in a proper case, be regarded as a vice principal, yet that this must not be understood to mean "that each separate piece of work was a separate department." In the Peterson Case, supra, it was held that the foreman of an extra gang of laborers, consisting of 13 persons, who were engaged in putting in ties, although he had power to hire and discharge men belonging to the extra gang, was not a vice principal. Following these decisions, we held in Coal Co. v. Johnson, supra, that a foreman in a coal mine, who had control of only 10 or 12 men, with power to direct their work, and was himself under the immediate orders of the pit boss and superintendent of the mine, was not a vice principal; and in City of Minneapolis v. Lundin, supra, that a foreman of a gang of men engaged in sewer building, who had been appointed by a superintendent of sewer construction, who was himself an appointee of the city engineer, upon whom was devolved, by the city charter, the general superintendence of all public works, was not a vice principal of the city; and in Balch v. Haas, supra, that a foreman of a gang of men engaged in street construction, when there were two gangs working under different foremen, neither of whom had control over the other was not a vice principal of the contractor by whom, and in pursuance of whose directions, the work of construction was being done, although the particular foreman did have power to hire and discharge men.

Cases supporting the view that under the facts of this case Bennett should be regarded as a vice principal might very likely be cited from some of the state courts, particularly decisions coming from those states which have been more liberal and less guarded than the federal courts in applying the doctrine of departmental control; but

a reference to such adjudications would be superfluous, since, as a rule, the cases referred to are not in harmony with the federal adjudications by which this court is bound. We are of opinion that, without departing from what was actually decided in either of the foregoing cases, the defendant company may be held responsible for the order negligently given by Bennett, and that it ought to be held liable on the ground that he was its personal representative as respects that branch of the enterprise which he had been appointed to superintend. The work undertaken by the defendant company was of such proportions that it had been subdivided into at least two departments, namely, into the sales department and the wrecking department, of which latter department Bennett was the head or superintendent, as the jury have found on sufficient evidence. The work which he supervised not only gave him authority and control over many men, including 15 or 20 foremen of gangs, but it was work which required careful supervision by a person who was skilled in the construction and dismantling of large structures, in order that it might be done with ordinary safety. It was clearly the duty of the wrecking company to appoint some one to exercise immediate and constant supervision over the work in hand, and over the unusually large number of men who were employed on the job; and this fact renders it extremely probable that, because of his skill and experience, Bennett had been selected for that purpose, and given control of the work, and that he was not merely an intermediary through whom Harris communicated his orders. We can hardly believe that the corporation would have been willing to allow a work of this magnitude and character to proceed from day to day without having a competent man like Bennett constantly on the ground, armed with authority to give such orders as he deemed necessary, and to meet every emergency as it arose, without consulting any superior. It must be borne in mind that the task undertaken was not like an ordinary business, which ran on well-established lines, and could be controlled by a foreman acting in pursuance of general instructions. It consisted in tearing down rather than building up, and owing to the size of the buildings, and the nature of the work, the laborers so engaged were liable, at any time, to be confronted with unexpected conditions which called for instant and decisive action by one who was well qualified to command. We conclude, therefore, that the person appointed to discharge such responsible duties should be regarded, not merely as a fellow servant, but as a vice principal, and that his employer ought to be held responsible for his negligent acts.

It is furthermore noteworthy that in the present instance the plaintiff was not injured by the negligent act of Bennett after he had descended to the plane of an ordinary laborer, and while he was assisting the plaintiff in doing the ordinary work of a laborer. He was injured in consequence of a negligent order given by Bennett, in the giving of which Bennett was obviously exercising the functions of the master. In the Baugh Case, 149 U. S. 368, 389, 13 Sup. Ct. 914, 37 L. Ed. 772, special attention was directed to the fact that in that case "the injury [complained of] was not in consequence of the fireman's obeying any orders of his superior officer," or, as the court fur-

ther say, "it did not result from the mere matter of control," but was due to the engineer's fault in running his engine. In view of this utterance, it might be inferred that, if the injury had been sustained in that case, as it was in this case, in consequence of the exercise of the power of control, the result might have been different. But, be this as it may, for reasons heretofore indicated we think that no error was committed by the learned trial judge in charging the jury that Bennett was a vice principal if he had been appointed to supervise the tearing down of all of the buildings, and was the superintendent of that work.

It is suggested in the brief of counsel for the defendant company, but the point is not argued at length, that the trial court erred in refusing an instruction which presented for the consideration of the jury the defendant's theory of Bennett's relation to that company. We find, however, that this theory was fairly presented to the jury for its consideration by the instructions which were given by the trial court. In one of these instructions the jury were advised, in substance, that if they believed from the evidence that Harris was in charge of the defendant's business at Omaha, in taking down the buildings, and planned the work of taking them down, and directed the methods to be pursued in that behalf, and that Bennett was subject to the orders of Harris in that respect, then Bennett was not a vice principal, even though the jury believed that he visited the various foremen, and gave them directions with respect to the work. This instruction was fully as favorable as the one which was asked by counsel for the defendant company with relation to the same subject-matter; and the refusal of the instruction which was asked cannot be regarded as a material error. The question as to whether Bennett was charged, by the defendant company, with the duty of supervising the dismantling of the buildings, and acted as superintendent of that work, or whether that duty was performed by Harris, seems to have been fairly submitted to the jury for its determination, with sufficient directions from the court concerning that subject.

The only other point which is pressed in argument is that the lower court misdirected the jury with respect to the measure of damages The jury were instructed on this head, in substance, that, while the Carlisle mortality tables had been introduced in evidence to determine the probable duration of the plaintiff's life, yet that they were not binding upon the jury, but were introduced in evidence merely as an aid to the determination of its probable duration. The jury were then directed, if they found that the plaintiff was permanently injured, to ascertain what effect, if any, such permanent injuries would have upon the plaintiff's powers to earn a livelihood; taking into consideration his ability to perform labor before he was hurt, and his previous earning capacity. The jury were also instructed that it would not be proper to multiply the amount of his annual earnings by his expectancy of life, and reach a result in that way, and that it was the province of the jury to ascertain, by the exercise of a sound judgment, what would be the present cash value of his earnings, considering his expectancy of life, whatever they might believe the probable duration of his life to be. The court then observed (and it is this

passage which is chiefly criticised): "Sometimes it has been said that it is such a sum which, if put at interest, would earn annually the amount of money which the testimony may show he might earn, * * * or did earn;" but, said the court, "this is not conclusive upon the jury; it all finally comes back to your sound judgment and discretion, so far as the loss of time is concerned, to fix the amount, in your sound discretion, governed by the rules which I have stated." The point of the objection seems to be that this instruction advised the jury that the proper method of computing the damages would be to multiply the loss of earnings each year by the plaintiff's expectancy, according to the Carlisle tables, and that this was an erroneous method of calculation. We do not so understand the instruction, nor do we think that it is fairly susceptible of such an interpretation. The jury were plainly told that the Carlisle tables were not binding upon them,—further, that although it had some times been said that the amount of damage was a sum which, if put at interest, would earn annually what he might have realized if unhurt, yet that this was not conclusive, and that after all the jury must exercise their sound judgment and discretion in determining the extent of his loss. Viewing the instruction as a whole, and bearing in mind that the subject to which it relates is one concerning which no very precise directions can be given, we are not able to say that it was materially erroneous. Besides, as the trial court, which had the power to set aside the verdict if the damages were excessive, did not see fit to do so, we infer that it did not regard the verdict which was rendered by the jury as excessive in view of the character of the plaintiff's injuries.

We do not find, in the proceedings below, any error which, in our opinion, will warrant a reversal of the judgment, and it is accordingly affirmed.

SANBORN, Circuit Judge (dissenting). The jury were instructed by the court below to ascertain by the exercise of their judgment what the present cash value of the plaintiff's earnings during his expectancy of life would be to him, and to allow this amount as one element of his damages. The only guide which the court gave them to direct their judgment in finding this amount was contained in these words:

"Sometimes it has been said that it is such a sum which, if put at interest, would earn annually the amount of money which the testimony may show he might earn annually,—the amount of money which the testimony may show he might earn or did earn; but this is not conclusive upon the jury; it all finally comes back to your sound judgment and discretion, so far as the loss of time is concerned, to fix the amount in your sound discretion, governed by the rules which I have stated."

Now the court had stated only one rule for ascertaining the damages for loss of earnings, and that was to allow such an amount as would produce annual interest equal to the amount which the plaintiff would have annually earned. If he would have earned $420 per annum, and the rate of interest was 6 per cent. per annum, they were to allow him $7,000, because $7,000 at 6 per cent. annual interest would produce $420 per annum. If his expectancy of life was 40

years, he would, under this rule, receive $420 per annum interest, and at the end of 40 years, when he died, he would have the entire principal, $7,000, remaining. In other words, he would have at his death just $7,000 more than he would have had if he had not been injured, and if he had constantly earned his wages, because the annual interest he would have received would equal his earnings, and the $7,000 would remain unimpaired at his death. No discussion or argument can more clearly demonstrate the error of this instruction than its statement, and this simple illustration of it.

It is said, however, that the court also told the jury that this rule was not conclusive, and that the jury might, so far as the loss of time was concerned, fix the amount of compensation for it in their sound discretion, governed by the rules which the court had given. But this statement was as vicious as the other. The court had given but one rule, and that rule was conclusive. It was conclusively wrong, and the charge of the court that it was not conclusive,—that the jury might follow it or not as they chose,—was as grievous an error as it would have been to have told them that they must follow it; because the verdict is general, and it is impossible to tell whether the jury applied or disregarded the vicious rule which the court submitted to them. There is every probability that they followed it, for the testimony shows that the earnings of the plaintiff never exceeded $420 per annum, and yet the jury rendered a verdict for $9,500. However this may be, the charge was erroneous, and the presumption is that error produces prejudice. This record does not show that the erroneous instruction did not guide the jury in their deliberations, and control the amount of their verdict, and such an error is always fatal unless it appears so clear as to be beyond doubt that it did not prejudice, and could not have prejudiced, the complaining party. Railroad Co. v. Holloway (C. C. A.) 114 Fed. 458; Association v. Shryock, 20 C. C. A. 3, 11, 73 Fed. 774, 781; Railroad Co. v. McClurg, 8 C. C. A. 322, 325, 326, 59 Fed. 860, 863; Deery v. Cray, 5 Wall. 795, 807, 808, 18 L. Ed. 653; Smith v. Shoemaker, 17 Wall. 630, 639, 21 L. Ed. 717; Moores v. Bank, 104 U. S. 625, 630, 26 L. Ed. 870; Gilmer v. Higley, 110 U. S. 47, 50, 3 Sup. Ct. 471, 28 L. Ed. 62; Railroad v. O'Brien, 119 U. S. 99, 103, 7 Sup. Ct. 118, 30 L. Ed. 299; Mexia v. Oliver, 148 U. S. 664, 673, 13 Sup. Ct. 754, 37 L. Ed. 602; Railroad Co. v. O'Reilly, 158 U. S. 334, 337, 15 Sup. Ct. 830, 39 L. Ed. 1006; Peck v. Heurick, 167 U. S. 624, 629, 17 Sup. Ct. 927, 42 L. Ed. 302. On account of this error in the instructions of the court, the judgment below should, in my opinion, be reversed, and a new trial should be ordered.

I am also of the opinion that there was no substantial evidence in the record that W. G. Bennett was the vice principal of the Chicago House Wrecking Company. The evidence seems to me to show without dispute that he was a mere foreman, acting all the time pursuant to the direction of Harris in his work of directing the various gangs of men, and their foremen in the discharge of their duties. It would, however, serve no useful purpose to review the voluminous evidence directed to this question, since the erroneous ruling of the court, to which reference has been directed, leads to the same result.