## NATIONAL STEEL CO. v. LOWE.

### (Circuit Court of Appeals, Sixth Circuit. January 5, 1904.)

### No. 1,212.

1. MASTER AND SERVANT—INJURIES TO SERVANT—DEFECTIVE APPLIANCES.

Plaintiff, a stove tender in defendant steelworks, was burned by molten iron from a blast furnace, caused by a water block being forced from the wall of the furnace. The block had become defective on the evening of the previous day, and the superintendent ordered preparations made to remove it. That evening the packing was removed to a depth of 9 or 10 inches, and between 7 and 8 o'clock the next morning the superintendent, though it had been his intention to remove the block when the blast was off the furnace during the 9 o'clock cast, on his being notified that the water was not running freely through the different blocks, by reason of the strainer being clogged, directed that the block should not be removed until 12 o'clock, and that the water strainer be repaired at the same time. Before noon, and while the blast was still on the furnace, and as certain workmen were preparing to pull out the block, the inside of which had become melted off by reason of the defect in the water apparatus, the block was suddenly forced from the wall by the pressure in the furnace, and plaintiff was burned by the flame and molten material issuing from the aperture. *Held* that, whether treated as a place at which to work or an appliance with which to work, it was

the positive duty of the company to keep the furnace reasonably safe for its employés at work about it. For any neglect to do this, the company was responsible, as the duty could not be delegated.

2. SAME—FELLOW-SERVANTS.
Whether the neglect was that of the superintendent or foreman, or a workman, in neither case was the person guilty of negligence a fellow servant of the plaintiff, so as to relieve the company of responsibility.

3. SAME—ASSUMPTION OF RISKS.
The removal of the water block under the circumstances described was not one of the risks which plaintiff assumed upon entering the employment of the company.

In Error to the Circuit Court of the United States for the Southern District of Ohio.

James C. Tallman, for plaintiff in error.

C. L. Weems, Chas. J. Lynch, and Fred Spriggs, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. Chester A. Lowe, the defendant in error, was employed by the National Steel Company, plaintiff in error, at Furnace No. 2, of its plant, in Bellaire, Ohio, and while so employed, on January 24, 1901, was badly burned, as he claimed, through the negligence of the company, by the sudden forcing from the walls of the furnace of a "water block." The original action was brought in the local state court, and removed by the company to the Circuit Court of the United States for the Southern District of Ohio. The trial court refusing to direct a verdict for the defendant, the case was submitted to the jury, and a verdict and judgment rendered for $10,000. The case is here on error.

Furnace No. 2 was a hot blast furnace, used to manufacture pig iron from iron ore. The raw material was dumped into the top of the furnace, and the molten product drawn off at the bottom. To melt the raw material, a high degree of heat was required, and, to produce and maintain it, air heated in hot blast stoves was pumped into the furnace by powerful blowing engines through tuyères. This process produced intense heat within the furnace, and a strong pressure upon its walls. To keep the walls cool, some 200 copper water blocks were inserted in the walls in the lower part of the furnace, and formed a part thereof. Water was conducted into these water blocks through pipes from a tank which was kept full of water pumped from the Ohio river. At the bottom of the tank, there was a perforated cylinder, which acted as a strainer, and around it a steel brush worked up and down to keep it free from mud and débris. To keep the blocks cool, the water had to be kept in constant circulation, and for this purpose had to be kept clear of any substance which would clog the smaller pipes through which it entered the blocks. A water tender looked after the circulation of the water, and a plumber was provided to make necessary repairs. A stoppage of the water while the blast was on would soon result in the melting of the inside ends of the blocks, and a consequent weakening of the walls.

The process of drawing off the melted iron at the bottom of the furnace through the tapping hole was called a "cast," and a cast was made every three hours. After casting, the blast was shut off until the tapping hole could be closed, when it was put on again. In the operation of the furnace, it was of great importance to keep the blast on as steadily as possible. The shutting off of the blast for any considerable time was liable to chill the furnace and cause serious trouble and expense. For this reason, it was usual to remove a leaking water block directly after a cast, and while the blast was shut off; and, in order to save time, the packing about the block to a safe depth was dug away in advance, so that the block might be promptly pulled out when the blast was shut off.

Aside from the superintendent, who had complete charge, the men working at the furnace were called the "furnacemen," and consisted of a turn foreman, who represented the superintendent in his absence, the stove tender, first and second helper, cinder snapper, scrapper, water tender, and plumber. They were divided into two gangs, the day turn being in charge of the superintendent; and the night, of the turn foreman. No one except the superintendent had authority to remove a water block. The work of removing a block was usually done by some of these men under the direction and supervision of the superintendent, or, in his absence the turn foreman.

The plaintiff below charged in his amended petition that, while the furnace was still in blast, the defendant below negligently and carelessly caused the brick, mortar, and fire clay to be dug away from immediately around one of the water blocks, so as dangerously to weaken the same, and, while it was in this weakened condition, carelessly and negligently permitted and caused the water pipes feeding the water block with water to become so out of repair and disconnected as not to feed the water block properly with water, and negligently and carelessly continued to operate the furnace, and to force air by means of the engines through the furnace, while the water block was in the condition mentioned, and by such negligence caused the water block to be violently forced from the wall of the furnace, whereby the molten metal and flame in the furnace were forced out of the opening thus negligently made, and against the body of the plaintiff, burning him, etc.

The answer of the company denied all negligence, alleged that the furnace was being operated in the customary and usual way when the water block was forced from the wall, and averred that the plaintiff was injured because he was not at his post of duty. It may be remarked that this defense—that the plaintiff below was not at his post of duty when hurt—was abandoned on the trial, the testimony showing conclusively that he was in the discharge of his duties when injured.

Upon the trial, testimony was introduced tending to establish the following facts: Harry Thomas was the superintendent of the furnace, in full charge of its operations, with authority to employ and discharge men, and order and supervise repairs. Next to him was the turn boss or foreman. The superintendent was the only one who had power to order the removal of a water block. Between 4 and 5 o'clock on the evening of January 23, 1901, it was discovered

that one of the blocks was leaking, and Thomas gave orders that preparations be made to remove it. About 6 o'clock, the turn boss, Dunn, then in charge of the night turn, gave directions to dig around the water block and get ready to take it out. Accordingly the packing about the block was removed to the depth of 9 or 10 inches. This work was completed between 10 and 11 o'clock that night. The cast was made at 12 o'clock, another at 3 a. m., another at 6 a. m.; and between 7 and 8 o'clock the superintendent, who had been off during the night turn, returned to the furnace. It had been the intention to remove the block on the 9 o'clock cast, the morning of January 24th, but Chissholm, the plumber, notified Thomas, when he reached the furnace, that it had developed at different water blocks that the water was not running as freely as it should, owing to the fact that the steel brush had become disconnected, and the strainer was more or less clogged. In view of this, Thomas directed that the removal of the water block should be postponed until the 12 o'clock cast, so that an additional plumber might be ready to repair the steel brush at the same time the leaking water block was removed. The postponement was to save time—to enable both things to be done while the blast was off. At noon all was ready to remove the water block and repair the steel brush. But while the blast was still on, and certain workmen were preparing to apply the pressure to pull the block, it was suddenly forced out of the wall by the pressure inside. Through the hole thus made, molten iron, cinder, and flame were discharged, killing one of the workmen, and badly burning the plaintiff, Lowe. While Lowe was a stove tender, and usually employed at the hot blast stoves, it appears that he was frequently used by the superintendent to "catch the test"; that is, to catch at the tapping hole a small amount of the cast to be used for testing purposes. He had done this, and was standing near the superintendent. The workmen were getting ready to pull the block, and the blast was still on. The attention of the superintendent was called to the fact that the block was hot; that blazing gas was issuing from around it. So he directed Lowe to go to the cord used to shut off the blast, and be ready to pull it when he gave the signal. Lowe had taken a couple of steps towards the cord when the block gave way. An examination of the block showed that its inside end had been melted off. There was testimony tending to show that the stoppage of the water caused the melting of the block, and softening of the packing left about it, and that the block was forced from the wall because the blast was left on while it was in this weakened condition.

While there are a number of assignments of error, based upon the denial of the motion to direct a verdict for the defendant, the refusal to give certain charges requested, and the charge as given, there is really but one question, namely, whether the court was warranted in submitting to the jury the question whether the negligence which caused the injury was that of the master, in failing to provide and maintain a reasonably safe place in which to work, and reasonably safe appliances with which to work, or whether it was that of a fellow servant in the use of appliances provided by the master for doing the ordinary work of the employment.

The court, after stating the claims of the defendant, and defining the rules of law both with respect to the duty of the master to the servant, and his exemption from liability for an injury to one servant through the negligence of a fellow servant, gave the following instruction:

"If the jury be of the opinion that the defendant was negligent in not removing the obstructions that prevented proper water supply, and if they find that the defendant was guilty of negligence in continuing the operation of the furnace after the packing about the block had been removed, yet, if these acts of negligence failed to cause the block to be driven out with force, suddenly, turning this molten mass upon the men employed around about it—if those acts of negligence did not cause that result, but if it was due to some other cause—then the plaintiff will not be entitled to recover, because he must not only show the acts of negligence which he has claimed, but he must show that they caused the injury of which he complains. Now, the defendant says that this block was driven from its place by an explosion within the block, caused by cold water being suddenly turned in when it was in a superheated condition, causing the steam and the gases to explode and drive it out. Now, if that be true—if it was driven out by an explosion from within the block—then the plaintiff's case fails, because there is no evidence here to show that that condition arose through any negligence on the part of the defendant, because it was a necessary condition to the explosion, as claimed by the defendant, that cold water should have been poured into it when it was in that superheated condition. If it was poured into, as claimed, I do not think there is any evidence here tending to charge the defendant with fault because of it; but, if the evidence fails to support the defendant's view of the case, then the jury must determine whether the block was forced out by the pressure from within, because of the weakened condition in which it was left by the removal of the packing, and because of the condition which was created there by the failure of the water supply. It is said that the packing that was left there was softened by the heating of the block, due to the failure of the water supply, and that that, and this weakened condition by the removal of the eight or ten inches of packing, brought it into a condition where the force within—and the strength of that force has been put before you—removed the block; ejected it from the wall a short distance upon the platform, I believe; and if you find that the block was forced from the wall by the pressure from within, owing to the weakened condition brought about by the removal of the packing, and the failure of the water supply, bringing it into a heated condition, that tended, as it is claimed, to soften the remainder of the packing there, then you will be warranted and required to find in favor of the plaintiff; that is— I presume the jury follow me, but, out of an abundance of caution, perhaps I ought to say that if the failure of the water supply was an act of negligence, as I have already defined negligence to you, and if leaving the block in the unpacked condition during the length of time that elapsed, up to the time of the cast at 12 o'clock the next day—if those were acts of negligence upon the part of the defendant, and if they caused this forcing of this block from the wall, then the plaintiff's case is made out, and you should return a verdict in his favor, and allow him such damages as, in your judgment, may be sufficient to compensate him for the injuries sustained."

We think the questions raised in the case were fairly and properly submitted to the jury.

The rule that a servant assumes the ordinary risks of the employment, and that the master is not liable for an injury to one servant resulting from the negligence of a fellow servant, has its limitations; and one is that a servant does not assume the risks resulting from a breach of the duty of the master to his servants. The master owes the servant the duty of providing a reasonably safe place in which to work, and reasonably safe appliances with which to work. This is a

direct and absolute obligation. The master cannot escape it by intrusting its performance to an agent or servant. Such agent or servant, although working side by side with a servant injured through his negligence, is not regarded as a fellow servant, but as a representative of the master, for whose acts the master is responsible. All the cases recognize this qualification or limitation of the general rule. Thus, in B. & O. R. Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, 37 L. Ed. 772, relied on by the plaintiff in error, in which it was held that an engineer, through whose negligence a fireman was injured, was a fellow servant, and the company not responsible, Mr. Justice Brewer, speaking for the court, said (page 386, 149 U. S., page 921, 13 Sup. Ct., 37 L. Ed. 772):

"It is the master who is to provide the place and tools and machinery, and, when he employs one to enter into his service, he impliedly says to him that there is no other danger in the place, the tools, and the machinery, than such as is obvious and necessary. * * * The employé has the right to look to the master for the discharge of that duty, and if the master, instead of discharging it himself, sees fit to have it attended to by others, that does not change the measure of the obligation to the employé, or the latter's right to insist that reasonable precaution shall be taken to secure safety in these respects."

In Central R. Co. v. Keegan, 160 U. S. 259, 16 Sup. Ct. 269, 40 L. Ed. 418, the court, speaking by Mr. Justice White, said respecting the holding in the Baugh Case (page 264, 160 U. S., page 270, 16 Sup. Ct., 40 L. Ed. 418):

"It was laid down that the rightful test to determine whether the negligence complained of was the ordinary risk of the employment was whether the negligent act constituted a breach of positive duty owing by the master, such as that of taking fair and reasonable precautions to surround his employé with fit and careful co-workers, and furnishing to such employé a reasonably safe place to work, and reasonably safe tools and machinery with which to do the work; thus making the question of liability of the employer for the injury to his employé turn rather on the character of the alleged negligent act than on the relations of the employés to each other."

In the recent case of Smith v. Erie R. Co., 67 N. J. Law, 636, 52 Atl. 634, 59 L. R. A. 302, in which the company was held responsible for an injury to a brakeman resulting from the derailment of a car caused by the track being out of repair, the New Jersey authorities are examined, and the rule in that state declared to be the same as that laid down by the Supreme Court of the United States; the test being (page 646, 67 N. J. Law, page 637, 52 Atl., 59 L. R. A. 302)—

"Whether the negligent servant was in the performance of work which the law imposes as a positive duty upon the master, by way of preparation for the general employment, or whether, on the other hand, such negligent servant was at the time in the performance of some duty incidental to the general employment itself. In the former case the master is liable; in the latter case, not. It is the master's duty to exercise reasonable care in furnishing those things which go to make up the plant and appliances, so as to have them at the outset reasonably safe for the work of the servants who are engaged in the general employment, and, further, to exercise reasonable care, by means of inspections, and repairs when needed, to keep the plant and appliances reasonably safe."

Akin to the New Jersey case are the cases of Calvo v. Charlotte, etc., R. Co., 23 S. C. 526, 55 Am. Rep. 28, a South Carolina case, and

Moon's Adm'r v. Richmond, etc., R. Co., 8 Va. Law J. 540, a Virginia case, cited by Judge (now Mr. Justice) Brewer in Howard v. Denver Ry. Co. (C. C.) 26 Fed. 837, in one of which a locomotive engineer, and in the other a brakeman, was injured by the negligence of sectionmen engaged in repairing the track. In each it was held that the sectionmen, being engaged in the discharge of the duty of the master to provide a safe and suitable place for the employés to work in and on, could not be regarded as fellow servants, within the rule exempting the master from liability for their negligence.

And so is the case of Davis v. Central Vermont R. Co., 55 Vt. 84, 45 Am. Rep. 590, in which the company was held responsible for the negligence of its bridge builder in constructing, and its roadmaster in repairing, a culvert, which washed out, derailing a train and killing a fireman. The court said:

"The bridge builder and roadmaster, while inspecting and caring for the defectively constructed culvert, were performing a duty which, as between the intestate and defendant, it was the duty of the defendant to perform. Their negligence therein was the negligence of the defendant."

It was the duty of the defendant below to provide its employés about this furnace a reasonably safe place in which to work, and to keep it so, and reasonably safe appliances with which to work, and to keep them so. If the plaintiff below, while engaged in the discharge of his duty, and without fault on his part, had been injured through the falling of a part of the roof of the casting house, caused by a defect to which the superintendent's attention had been called, but which he neglected to repair, it would hardly be contended that the company would not be responsible; and this would be true although there were workmen at the furnace, whose duty it was to make repairs when directed by the superintendent. And so, if one of the hot blast stoves had become defective, and the superintendent neglected to repair it, although his attention was called to it, and the company continued to operate it, and as a result there was an accident, and Lowe was hurt while in the discharge of his duty and without fault upon his part, undoubtedly the company would be liable.

There is no essential difference between these illustrations and the case presented. In one sense, the furnace was a part of the place in which Lowe had to work, and in another it was a part of the appliances with which he had to work. The company owed its employés about the furnace the duty of making and keeping the furnace reasonably safe in both respects. It failed in its duty if it began to operate a furnace not reasonably safe, and it equally failed in its duty if it continued to operate a furnace which had ceased to be reasonably safe. It had no right to put the blast on until the walls of the furnace were reasonably secure, or to keep it on after they had ceased to be reasonably secure.

The plaintiff in error submits that the removal of a water block was part of the ordinary work of operating the furnace, and the risks attending such removal must therefore be regarded as the risks of the employment, and the men intrusted with the work of removal as fellow servants. Certainly the testimony fails to show that the removal of a water block was a matter of frequent occurrence. Lowe's testi-

mony, undisputed upon the point, was that this was the first block ordered or attempted to be removed on his turn; and in this case the work of preparing the block for removal was not done by men employed about Furnace No. 2, but by certain workmen of Furnace No. 1, then out of blast. They were called in by the superintendent, who ordered the removal of the water block. But passing these things, which are of little moment, the work of repairing the place or plant, and keeping it safe, is none the less the master's because it must be done while the plant is being operated, or by the regular workmen under employment of the company. Every plant of magnitude must be kept in operation, and yet at the same time be kept in repair. It is true with regard to a roadbed and the rolling stock of a railroad. Other instances will suggest themselves. Nevertheless the work of keeping the plant in safe condition is that for which the master is directly responsible, no matter who does it.

It was the contention of the defendant below that, in the operation of this furnace, it was customary for the furnacemen to remove a water block. On the other hand, the plaintiff below insisted that the furnacemen had no authority to remove a water block, except by direction of the superintendent, or, in his absence, the turn foreman. The duty of keeping the walls of the furnace reasonably safe being the master's duty, it made no difference to whom the work of repair was intrusted—whether to the superintendent, as the immediate representative of the company, or to the superintendent in connection with the furnacemen engaged in the operation of the furnace. In either event, the work of repairing the furnace and keeping it in reasonably safe condition would be the master's work; and it would remain the master's work, whether done by servants who did nothing else, or by servants whose time for the most part was given to the business of operating the furnace. The repairing of a defective boiler might be intrusted to the engineer who ordinarily operated it, or to a mechanic whose whole time was given to repair work. But whether done by one or the other, if negligently done, and the boiler remained in a defective condition, the master would be responsible for any resulting injury to an employé.

The negligence charged and submitted to the jury was not that of the workmen engaged in taking out the water block, but that of the superintendent, who, with knowledge of its weakened condition and of the defective working of the water supply, continued the operation of the furnace, instead of shutting off the blast. One of the defenses was that the water block had been forced out by an explosion due to the careless introduction of water into the block when red hot, but the finding of the jury was that this theory was not sustained by the proof. The jury necessarily found that the accident resulted from the company's negligence in continuing to operate the furnace when the condition of the water block had become so dangerous as to demand the shutting off of the blast.

Somewhat similar was the situation disclosed in the case of Illinois Steel Company v. McFadden, 196 Ill. 344, 63 N. E. 671, 89 Am. St. Rep. 319, where a furnaceman was injured by the blowing out of a water block or bosh plate which they were attempting to remove with

the blast on. It was urged in that case, as in this, that the injury was due to the negligence of a fellow servant engaged in removing the block, in not reporting to the superintendent that the block was danger-ously loose. But the court held that the injury resulted from the negligence of the superintendent in directing the plate to be removed while the blast was on, and that in making this order the superintendent represented the company. Now, in the present case, in directing that the removal of the water block be postponed until the 12 o'clock cast, when both the steel brush and water block could be repaired at the same time, the superintendent represented the company, which, under the instruction of the court below, was properly held responsible for his action.

The judgment of the Circuit Court is affirmed.