NATIONAL REFINING CO. v. WILLIS.

(Circuit Court of Appeals, Sixth Circuit. February 16, 1905.)

No. 1,470.

MASTER AND SERVANT—INJURY OF SERVANT—UNSAFE APPLIANCE.

Where, in the construction of an oil tank by defendant company, 40 feet in height, it was necessary to build a scaffolding across the top, after the sides were completed, to hold the workmen and their tools while constructing the roof, and also as a support for a jack to lift and hold in place the steel rafters in the center until they were so secured as to be self-supporting, it was the positive duty of defendant to make such scaffolding strong enough for both purposes and reasonably safe, not only as a place to work, but as an appliance to work with in constructing the roof; and it is liable for the death of a workman, who was killed by reason of the falling of the scaffold while being used in the ordinary way, because of its negligent construction and insufficient strength.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, § 207.]

In Error to the Circuit Court of the United States for the Northern District of Ohio.

Blandin, Rice & Ginn (Ross & Kinder, of counsel), for plaintiff in error.

Blackford & Blackford, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. This was a suit for the wrongful death of the plaintiff's intestate, Willis, who was killed by the fall of a scaffold built and used in the erection of a large tank for the storage of oil. The scaffold was built by a tank carpenter and his assistant, especially employed for the purpose. Willis was employed to assist in riveting the tank. It was charged the scaffold fell because it was negligently constructed; that it was not reasonably safe, either as a place for the employés to work while erecting the tank, or as an appliance with which to work. The case was submitted to the jury, and there was a verdict and judgment for the plaintiff. In addition to the denial of the court to direct a verdict for the defendant, the errors assigned are based on the refusal to give certain charges requested and on exceptions taken to portions of the charge given.

There was testimony tending to establish the following facts: The tank to be constructed was circular in form, about 40 feet in diameter, and 40 feet high to the roof. The sides were of sheets of steel riveted together in rings. The roof was to be made of sheets of iron, supported on iron rafters; the outer ends being riveted by angle irons to the top of the tank, and the inner ends coming together at the center, forming a shoe about 3 feet higher than the top of the sides. In constructing the tank, it was necessary to build a shell scaffold, about 5 feet wide, both on the inside and the outside of the tank. For each ring added to the shell as the work progressed upwards, it was necessary to construct a new shell scaffold. The construction of the

tank was in the hands of one Hummel, as the representative of the company, who had full charge of the entire work. He employed a gang to erect the tank. Willis was one of them. He assisted in the work of riveting. In addition he employed a tank carpenter, one Brown, with an assistant, to construct the scaffolds under his (Hummel's) direction, and he did so. When the sides of the tank were completed, it was necessary to put on the roof, and Brown, acting under Hummel's orders, constructed a scaffold or platform, extending from the shell scaffold on one side of the top of the tank to that on the other, for use in putting on the roof. This was made of three pieces of timber, 6 inches by 4, on which loose boards were laid. The center piece was about 37 feet long and was spliced. The side pieces were each 8 or 10 feet from the center and were not spliced. To strengthen the center piece, Brown built below it a V-shaped truss or brace, made of boards 6 inches wide and 1 inch thick. After this platform was constructed, the adjustment of the rafters was begun. There were, in all, 14 rafters. They were adjusted in order, beginning at a certain point and proceeding around the circular top of the tank. After 3 were adjusted, it became necessary, in order to adjust the next, to furnish a support and lift for the inner ends of the rafters forming the central shoe. Accordingly, an oil barrel was placed on the scaffold near the center, on it a block, then a jack, and between the jack and the shoe another block. By putting a pressure on the jack, the inner ends of the rafters forming the shoe were held and lifted until the adjustment was made. Proceeding in this way, 11 of the rafters were thus adjusted, being riveted to the angle iron at the top of the sides and to the shoe in the center. At this point, with 3 rafters yet to be adjusted, it was observed that the truss or brace under the middle piece of the scaffold had shifted or tilted, and was out of alignment some 6 or 8 inches. Brown testified this was caused by the pressure of the rafters. Hummel's attention being called, he directed Brown to straighten the brace and Willis to assist him. Brown went below to get his tools. Willis, taking a rope, went out to the center of the scaffold and seated himself crosswise of the center piece. Then the center piece broke, the platform fell, and Willis was killed.

There was expert testimony to the effect that it was necessary, in constructing a roof of this sort, to erect a central support, resting upon the ground, which would sustain the weight of the rafters until they could be adjusted and become self-supporting. Brown, the tank carpenter, testified that, while the work of placing the truss or brace under the scaffold was going on, he told Hummel of it, who said he thought it would be all right just to put the timbers across without any support. Brown says he told Hummel he did not believe it was safe; that a bearing should be built up in the middle, something in the shape of a derrick. Hummel answered it would be "too much expense and material." When the V-shaped brace was found out of alignment, Brown says Hummel asked him why the scaffold would not carry the weight, and he told him it was because he had the weight on the roof. Hummel said he didn't think it would break. Brown told him it would if he kept the weight there. Then Hummel issued

instructions to straighten it. The deceased, Willis, was not Brown's helper. He worked on the outside of the shell, assisting in riveting. The shell of the tank being completed, he was doing nothing at the time he was directed to assist Brown.

We think these facts, which the jury were at liberty to regard established by the testimony, were sufficient to justify the court in declining to direct a verdict for the defendant. It is true that, if the scaffold was constructed for the sole purpose of holding the workmen and their tools, and during the progress of the work, because of an unexpected emergency, not within reasonable contemplation, was improperly used also as a foundation for the jack and its pressure, the negligence consisting solely in such use, no recovery could be had; for the negligence would be that of a fellow servant. In other words, if the scaffold was fit for the intended use, and was negligently used for an improper and unanticipated one, the company would not be liable. Maxfield v. Graveson, 131 Fed. 841, 65 C. C. A. 595, 598. But, on the other hand, if the scaffold was erected, not only for the purpose of holding the workmen and their tools, but also of serving as a foundation for the jack and its pressure, and through the negligence of Hummel it was not made strong enough, and broke, the company would be liable; for the duty to make it strong enough for both purposes, and reasonably safe, not only as a place to work, but as an appliance to work with, in erecting the roof, would be a positive one, which could not be delegated, so as to relieve the master from responsibility. National Steel Co. v. Lowe, 127 Fed. 311, 62 C. C. A. 229, 235; Chambers v. American Tin Plate Co., 129 Fed. 561, 64 C. C. A. 129. If the jack supplied by the company through Hummel had proved defective and broken, and as a result a workman, without fault on his part, had been hurt, the company would have been liable; for it was bound, as a personal duty, to furnish a reasonably safe appliance for raising and holding the rafters. The case of the scaffold, on which the jack rested, was in nowise different. It, too, was an appliance for the same purpose and came under the same rule.

Now, the question of fact as to the nature of the negligence which caused the accident, whether one of use or one of construction, was submitted to the jury under proper instructions, and the jury necessarily found that the negligence was in the construction, and not in the use, and that Hummel, as the direct representative of the company, should have anticipated the use and made the scaffold strong enough to bear it; negligently failing to do which, the company was liable. This disposes of the main question in the case, and furnishes the rule for the determination of the others.

The defendant made seven requests to charge. The court gave the first and second, refused the third, fourth, and fifth, and slightly modified the sixth and seventh. The applicable propositions of law contained in the third, fourth, and fifth are stated in the sixth and seventh, and in the general charge. In addition, these requests contain statements of fact not established beyond dispute by the evidence. They were, therefore, properly refused. The sixth request was of

doubtful propriety, even as aided by the qualifications added by the court. The addition made to the seventh was intended to keep before the jury the distinction to which we have already alluded between negligence in construction and negligence in use, and in our opinion was not only proper, but necessary. The jury was instructed that if the negligence shown was only in the improper use of the scaffold—that is, only in the doing of a detail of the work of constructing the tank—the company could not be held liable, for the negligence would be that of a fellow servant; but at the same time it was cautioned that if the use could and should have been anticipated, and in spite of this an inadequate and dangerous scaffold was constructed, not reasonably safe for the purposes contemplated, and the accident resulted as a consequence, the company would be liable, for the duty of making such a scaffold reasonably safe was a positive and nondelegable one. These seem to be the only points which need discussion.

The judgment is affirmed.