PETERS et al. v. GEORGE.

(Circuit Court of Appeals, Third Circuit. May 13, 1907.)  •

No. 13.

1. MASTER AND SERVANT—LIABILITY OF MASTER FOR NEGLIGENCE OF SERVANT —FELLOW SERVANTS.

Under the modern rule of the federal courts the theory of vice principal as determining the liability of a master to a servant for the negligence of another employé has been largely discarded, and the distinction between negligence which is to be imputed to the master and that which is to be considered as merely and solely the negligence of a fellow servant turns rather on the character of the act than on the relation of the employés to each other.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 385, 422–448.]

2. SAME—SERVANT SET AT DANGEROUS WORK—DUTY OF MASTER TO WARN AND INSTRUCT.

The duty to warn and instruct an employé who is set to perform a dangerous work with which he is unacquainted is a primary and absolute duty of the master to the servant, and he cannot relieve himself of liability for its nonperformance by delegating or intrusting it to a subordinate or to a fellow servant of such workman. Nothing short of actual notice of the danger to the workman who is to encounter it, with such cau-

tionary explanation as may enable him to avoid it, will satisfy the requirement of the law, and the default of an intermediary, whether he be the highest officer in control or merely a fellow workman of the one exposed to the danger, is the default of the master.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 385, 418, 419.]

**3. SAME—INJURY TO SERVANT—ACTION FOR DAMAGES.**

Plaintiff was employed by defendant as a common laborer in an open slate quarry, working under a gang boss, chiefly about the hoisting engine, in loading boxes, etc. He was not an experienced quarryman, and had never had anything to do with blasting. Three blasts had been put in, and after all the men had gone up out of the quarry an attempt was made to explode them by electricity, which failed. Some of the men with the gang boss then went down, and the boss set plaintiff to dig the tamping out of one of the holes with a crowbar, and while so engaged the blast exploded and he was injured. Plaintiff had never done such work, and the evidence showed that it had never before been done in the quarry while he was employed there. He was given no warning of the danger, and no instruction except to pour water in the hole as he worked. There was expert testimony that the drilling out of unexploded charges was highly dangerous and in the proper conduct of the work should never be done, and also testimony that it was contrary to the orders of defendant's superintendent, but such orders were not shown to have been known by plaintiff. *Held*, that the negligence of the gang boss was imputable to defendant, and that the question of its liability for the injury was properly submitted to the jury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 313–316.]

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

Owen J. Roberts, for plaintiffs in error.

James S. Rogers, for defendant in error.

Before DALLAS, GRAY and BUFFINGTON, Circuit Judges.

GRAY, Circuit Judge. The plaintiffs in error, hereinafter called the "defendants," were the owners of a slate quarry near the town of Slatington, in Pennsylvania, and the defendant in error, hereinafter called "the plaintiff," was employed by them as a laborer in said quarry. The plaintiff, a Syrian and a subject of the Sultan of Turkey, brought suit in the Circuit Court of the United States against the defendants for compensation for bodily injuries suffered by him while working in defendants' quarries, and which he alleges were due to the negligence of the defendants. At the trial, the case was submitted by the court below to the jury, reserving as a question of law, whether "there is any evidence to go to the jury in support of the plaintiff's claim." The verdict was for the plaintiff, for $8,000, and the defendants made a motion for judgment for the defendants on the point of law reserved, non obstante veredicto, which motion was denied, and to the judgment entered upon the verdict, this writ of error has been sued out.

The material facts of the case, as gathered from the testimony sent up in the record, are as follows: On October 5, 1904, the plaintiff was in the employ of the defendants, in their slate quarry above referred to. His work was that of a general laborer, including carrying water

for the engines, carrying powder for blasting, and sometimes aiding in the drilling of blast holes, and loading boxes with slate to be hoisted out of the quarry. He had worked in the quarry for about two years prior to the accident. The quarry, which was an open hole or pit, was about 200 feet long and from 150 to 225 feet deep, about 45 feet wide at the bottom and about 80 feet wide at the top. Wire ropes were stretched across the top of the quarry, upon which were slung boxes that were drawn out on the wires over the middle of the quarry, whence, by suitable tackle, they could be lowered into the quarry and were used for carrying men and materials up and down. The offices and mills for preparing the slate for market were on the surface. In these offices, were the superintendent, clerks and superior officers of the defendants. They were, therefore, quite separated from and out of touch with the men employed in the quarry, 150 or 200 feet below. These men, 16 or 18 in number, one of whom was the plaintiff, were employed in the actual blasting of the slate and the work incident thereto, such as running the engines, loading the boxes, etc. They were under the general charge of 'one David Blose, who had been a long time employed as a quarryman and who, according to his own testimony, did all kinds of general work, but had authority "to place the men where I wanted them, under the instructions of the superintendent," the superintendent giving directions as to how the quarry was to be operated and the mining conducted. Blose was evidently what, in much outdoor work of this kind, is termed a "gang boss." On the day in question, three holes, seven or eight feet deep and three or four inches in diameter, had been drilled perpendicularly in a bench of rock. These holes were several feet apart and had been loaded, two of them with black powder and the other with dynamite. They had been tamped with mud or clay, and wires had been put in place, connecting caps imbedded in the powder and dynamite with electric batteries upon the surface. The men down in the quarry were all hoisted out, as the custom was when blasts were about to be made, and the holes were then attempted to be set off by an electric spark. There were no explosions, however, and a second and third attempt having failed, the men, or some of them, were lowered down into the mine with Blose, the gang boss. According to the testimony of the plaintiff, Blose went up with a drill or crowbar and a bucket of water to one of the holes which had failed to explode, and was proceeding to take out the tamping and the charge. The plaintiff, coming near him with a bucket of water, which he was carrying to or from the engine room, was called by Blose and told to proceed with the operation which he, Blose, had begun, and was given a drill or crowbar and a bucket of water to use in the work. Blose then left the plaintiff digging out the unexploded hole. Within a few minutes after this, one Fritzinger, another employé, came up to where plaintiff was working and, asking what plaintiff was doing, proceeded to work at a hole alongside. Samuel Hanna, another employé in the quarry at the time, testifies that he heard David Blose order the plaintiff to drill out this hole. He says:

"Elias was coming with a bucket of water to assist a man who was working on the steam engine. Davie Blose asked Elias, 'Where are you going?' He told him that he as going to assist the men 'working on the

engine. He said, 'No. you come and dig out the hole, the middle hole.' Elias said he did not know how to do it. He instructed him to get a piece of machinery to lift the rock, not a drill, a bar. It is a kind of lever. He put some water in the hole, David Blose did, and showed Elias how to drill. After that, I was working in a different part of the quarry and all I remember was the explosion. That is all I know about the case."

David Blose's testimony conflicts somewhat with these statements, but that is immaterial on the question, whether there was any evidence to go to the jury in support of the plaintiff's claim.

There is evidence tending to show that the plaintiff was not an experienced quarryman in that branch of the work, more immediately connected with the blasting itself. He testifies that he was principally employed about the engine, although he sometimes assisted in drilling the holes by hammering on the top of the hand drill, held by a quarryman. It is undisputed that he had never been employed in digging out the charge from unexploded holes. Indeed, there is testimony to the effect that this had never before been done, at least while plaintiff worked there. The plaintiff was thus taken from his ordinary employment, and put at work that he never before had done, and there is no evidence to show that Blose gave him any other instructions than merely to dig out the hole with the crowbar or lever described, and to use water in doing so. And as Blose himself was examined at great length, it must be inferred that no caution, or explanation of any kind, was given as to the danger accompanying the operation plaintiff had undertaken. The evidence does not show that plaintiff was an experienced quarryman, in the matter of conducting the blasts or the work of preparing and charging the holes with explosives. He was an ordinary laborer in the quarry pit, working for 17 cents an hour, and could speak very little English, his testimony having been given through an interpreter.

The general and personal duty imposed by law upon a master, to use reasonable care,—that is, care in proportion to the exigencies and danger of the situation, to safeguard the place and conditions in which and under which an employé is to work, certainly required that such a person as the plaintiff was, in respect to experience and intelligence, should have been specially warned as to the danger of the work he was ordered to do, if, indeed, under the circumstances shown, he should have been allowed to attempt the work at all. Yet, there is ample testimony tending to show that he was not told that the work was exceedingly dangerous, even with water in the hole, or that the cap would be set off by a comparatively light blow of the tool with which he was working, and would explode the charge in the hole. He was merely told to proceed with the work, and he did so, putting water in and pounding with the heavy iron drill, as directed by the mine boss, until the explosion occurred, with the consequent loss of both his eyes.

One of the main contentions of the defendants is, that Fritzinger, plaintiff's co-employé, came to where the plaintiff was digging the hole, as described by Blose, and began digging an adjoining unexploded hole; that the Fritzinger hole was the one that exploded later and injured George; that the injury thus occasioned was caused by

the negligence of Fritzinger, George's co-employé, and the defendants were not responsible. But, unfortunately for this contention now made by the defendants, the verdict of the jury negatived the existence of such facts. The court submitted this contention to the jury, with conspicuous fairness to the defendants, charging as follows:

"A good deal of the defendants' testimony bears upon the subject that I have already spoken to you about, but the principal defense is that the plaintiff was injured by the negligence of a man for whom concededly the defendants were in no way responsible; that is to say, Fritzinger, if that is his name. If that is true, if the injury to the plaintiff was caused as Fritzinger said himself upon the stand, then the defendants are in no way responsible for his act, with this single qualification: that if Mr. Blose was representing the defendants, under the instructions I have just given you upon the preceding branch of this subject, and if he saw Fritzinger about to tap this hole with a drill, then unquestionably it would have been his duty to do what he could to prevent as dangerous a thing as that, and if he saw it and failed to do it, then, of course, he might have been negligent in the discharge of that duty. But the testimony on that point, I think, is comparatively slight. I cannot withdraw it from the jury, but I do not think the jury will be likely to pay much attention to the testimony upon that subject. I think they will be likely to direct their attention to the point about which I have just spoken, namely, whether Fritzinger did do the thing which he said he did, and whether it was that that caused the injury to the plaintiff; because, I repeat, if he did, then the injury was caused by Fritzinger's act, and he was not directed to do that by Blose or by anybody else, so far as appears. It was a voluntary act upon his own part, if it took place in that way."

After such a charge, the jury must, by their verdict, be taken to have negatived the facts upon which this contention was founded, and consequently we have before us the case of an explosion at a hole at which George was put to work by Blose without instructions.

It should not be overlooked that Mr. Williams, chemist at the United States arsenal at Frankford, whose business it was to deal and experiment with explosives of all kinds, after hearing, in a hypothetical question, the facts of the present case, testified as an expert that he should consider "that for any person to order a man to clean out such a hole so charged, with an iron bar was either criminal carelessness or criminal idiocy. The proper method in such a case is to drill another hole in the vicinity of the undischarged hole, put in a fresh charge, explode that, and so explode the undischarged hole." To the same effect was the testimony of another witness, for a long time familiar with the operation of quarries. This testimony was before the jury, and, if believed, it made no difference which hole exploded, because the negligence would be in permitting loaded holes to be dealt with at all in this manner. It is true that Handwerk, the superintendent of the quarry, testified that there were standing orders that unexploded holes were not to be drilled out, but nothing was said as to whom these orders were communicated, and certainly there was no evidence that they were communicated to plaintiff. An offer was afterwards made by defendant, to prove that Handwerk instructed Blose, as he was about to descend into the quarry after the attempts had been made to discharge the holes, that none of the unexploded holes should be drilled out. This offer was properly refused by the learned judge, on the ground that it was not also offered to show that

the instructions to Blose were passed on to the plaintiff. We are dealing now with what must be conceded to be a primary and absolute duty of the master to the servant, the liability for the nonperformance of which the master cannot relieve himself by delegating it to any other person, whether of the highest or lowest rank in his service.

Much argumentation has been devoted by counsel on both sides to the question whether David Blose was to be considered as a vice principal of the defendants, or merely a fellow servant of the plaintiff, the consequence on the one hand being that defendants would be responsible for injuries occasioned by his negligence, while on the other, it would be merely the negligence of a fellow servant, and one of the risks assumed by plaintiff in entering defendants' employment. While at one time the so-called theory of vice principal was much resorted to, in working out the liability of a master for injuries to an employé incurred in his service, it has, subsequently to the decision of the Ross Case, 112 U. S. 377, 5 Sup. Ct. 184, 28 L. Ed. 787, been largely discarded, at least in the federal courts, and the distinction between negligence that is to be imputed to the master, and that which is to be considered as merely and solely the negligence of a fellow servant, has been placed upon a more satisfactory and rational basis. In the opinion of Mr. Justice Brewer, delivering the judgment of the Supreme Court in B. & O. R. R. Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, 37 L. Ed. 772, the whole subject has been instructively discussed, and it has been clearly and logically settled upon what grounds a master may be held liable for injuries incurred by a servant in the course of his employment. The question is always, whether the negligence charged is the neglect of a primary and absolute duty of the master to the servant. If such be its character, no delegation of the performance of that duty to another, no matter how inferior his rank may be in the master's service, can, as we have already said, relieve the liability of the master for its neglect. The master does not insure the safety of the servant, but he does undertake that the place in which he works, and the appliances with which he works, and the conditions under which he works, shall be reasonably safeguarded. A dereliction of the humblest employé in the master's service, to whom any part of such duty has been delegated, is the dereliction of the master. Therefore, in the language of the opinion just referred to, it will be seen that the question turns rather on the character of the act than on the relation of the employés to each other. It has never been doubted that a master's duty to an ignorant or inexperienced workman, indeed to any workman about to undertake more than ordinarily dangerous work, is to explain its dangerous character and give adequate caution as to its prosecution. This duty is of the absolute, personal character above referred to, and is not discharged by merely intrusting its performance to a properly selected subordinate. Nothing short of actual notice of the danger to the workman who is to encounter it, with such cautionary explanation as may enable him to avoid it, will satisfy the requirement of the law, and the default of the intermediary, whether he be the highest officer in control, or merely a fellow workman of the one exposed to the danger, is the default of the master. In such

a case, all question as to whether the immediate cause of the injury was the negligence of a fellow servant, is eliminated, and inquiry as to the extent of the control and authority committed by the master to the culpable agent, beside the issue, which is solely as to the character of the act or omission, and not the rank, of the offending servant.

Reasonably efficient supervision of work of the dangerous kind here described, must be held to be one of the primary and personal duties of the master. That there was evidence tending to show that such supervision was lacking here, cannot be denied. No evidence was adduced on behalf of the defendants, to show either efficient supervision or the establishment and enforcement of rules and regulations adequate to the protection of such employés as the plaintiff. The plaintiff charges in his statement of claim, that defendants conducted their business generally in an improper and unsafe manner, and specifically were negligent in "managing, attending to, or removing unexploded charges in blast holes," and the jury would not be unjustified in inferring from the evidence that this charge was sustained. Such default in the general management and conduct of so dangerous a business, was a default of the defendants.

The fact that the plaintiff was put at work, without being informed of its exceedingly dangerous character, as testified to by the expert witnesses above referred to, not only justified but required that the case should have been submitted to the jury, and as the refusal of the judge to enter judgment for the defendants, non obstante veredicto, is the only assignment of error, the judgment below must be affirmed.