### IN THE

# SUPREME COURT OF TENNESSEE

### FOR THE

## EASTERN DIVISION.

### KNOXVILLE, SEPTEMBER TERM, 1913.

## MANESS v. CLINCHFIELD COAL CORPORATION.

### (*Knoxville.* September Term, 1913.)

1. **MASTER AND SERVANT.** Injuries to servant. Actions. Jury question.

In a personal injury action, evidence *held* sufficient to show that the servant at the head house of defendant's mine was acting within the scope of his authority and about the business of the master, when he dumped coal into the chute and upon plaintiff. (*Post, p.* 150-152.)

2. **MASTER AND SERVANT.** Injuries to servant. Fellow servant.

A master is not liable to a servant for injuries resulting from the negligence of a fellow servant engaged in the common employment, where there has been due care in the selection and employment of the fellow servant. (*Post, p.* 152-155.)

Cases cited and approved: Railroad v. Wheless, 78 Tenn., 741; Railroad v. Edwards, 111 Tenn., 31; Railroad v. Lahr, 86 Tenn., 335; Fox v. Sandford, 36 Tenn., 36; Railroad v. Elliott, 41 Tenn., 611; Railroad v. Rush, 83 Tenn., 151.

(143)

Maness v. Coal Corporation.

Cases cited and distinguished:   Railroad v. Wheless, 78 Tenn., 741; Railroad v. Edwards, 111 Tenn., 31.

3. **MASTER AND SERVANT.**  Injuries to servant.   Negligence of fellow servant.

Where a servant employed to represent the master in the general supervision of the work departs from the scope of his employment and does the work of a fellow servant, the master is not liable for his negligence when so employed, but if the negligent servant has been designated by the master as one to perform a personal duty, which the master owes to other servants, his negligence in the performance of that duty is the negligence of the master without regard to the general grade of his employment.   (*Post, p.* 152-155.)

4. **MASTER AND SERVANT.**  Injuries to servant.    Duty to warn.

Where a mining company employed a carpenter to repair a coal chute, down which coal was dumped while the carpenter was at work, it is the duty of the company to warn the carpenter before coal is dumped into the chute.   (*Post, p.* 155-159.)

Cases cited and approved:   Western Electric Co. v. Hauselmann, 69 C. C. A., 346; Brewing & Malting Co. v. Bosch, 41 C. C. A., 482; Orman v. Salvo, 54 C. C. A., 265; Pantzar v. Mine Co., 99 N. Y., 368; McGovern v. Railroad, 123 N. Y., 280; Stone Co. v. Mooney, 61 N. J. L., 253; Peters v. George, 83 C. C. A., 408; Curley v. Hoff, 62 N. J. L., 760; Brick Co. v. Shanks, 69 Kan., 306; Hendrickson v. Gypsum Co., 133 Iowa, 89; Brice-Nash v. Barton Co., 79 Kan., 110; Bridge Co. v. Valente, 7 Peunnewill (Del.), 370; Coal Co. v. Hamilton, 107 Tenn., 705; Freeman v. Railroad, 107 Tenn., 340.

Case cited and distinguished:   Anderson v. Coal Co., 108 Minn., 455.

5. **MASTER AND SERVANT.**  Injuries to servant.   Negligence of fellow servant.

Where a mining company had its carpenter repair a coal chute, which was being used while the repairs were in progress, the master is liable for the negligence of another servant, who had

been warning the carpenter before coal was dumped, where he dumped coal down the chute upon the carpenter without warn-. ing. (*Post*, *p.* 155-159.)

## FROM WASHINGTON.

APPEAL from Law Court of Washington.—DANA HARMON, Judge.

HARR & BURROW, for plaintiff.

J. NORMENT POWELL and J. R. SIMMONDS, for defend-ant.

MR. JUSTICE LANSDEN delivered the opinion of the Court.

This is an action for personal injuries brought by Maness against the Clinchfield Coal Corporation, which resulted in verdict and judgment for plaintiff in the sum of $10,000. The defendant below appealed to the court of civil appeals, and in that court the judgment was reversed and the suit dismissed.

The declaration charged that the plaintiff was em-ployed by the defendant to repair a coal chute which was used by the defendant for the purpose of con-veying coal from cars which carried it out of the mine to railroad cars below, used in loading it for shipment. Plaintiff was at work in the chute near its bottom when the defendant, without warning or notice to him,.

128 Tenn. 10

dumped a carload of coal into the chute at the top which rolled down the chute and hit the plaintiff.

By an amendment to the declaration made later, it was averred, in addition to the failure to warn, that the defendant had failed to furnish a safe place to work.

The evidence from the plaintiff's view establishes the following facts:

The defendant was operating a certain coal mine, and conveyed the coal from the inside of the mine to its mouth in cars. At or near the mouth of the mine is located what is termed the "head house." The man in charge of the head house would dump the coal out of the cars into a chute which extended downward from the mouth of the mine to a point immediately over two railroad tracks side by side, and the coal would flow out of the chute into cars standing on the railroad tracks. The chute is about 300 feet long, about four feet wide at the bottom, and 3 or 3½ feet high, and slopes inward from the bottom to the top, so that it is about 12 inches wide at the top. It inclines from the head house to the tipple at the railroad tracks at the rate of 7½ inches to the foot so that it was about as steep as an ordinary house roof. A short distance from the foot of the chute was a strong gate. Just below this gate were screen bars, and below the screen bars was a wind or curve in the body of the chute. Coal would be dumped into the chute at the head house and would run down to the gate, where ordinarily it would be caught and held. The gate could be raised

by means of a rope which was operated by men on the railroad cars below the chute. When the gate was raised and the coal released, it would flow over the screen bars, and coal of certain fineness would fall through the bars into a railroad car standing on the railroad track under the screen, and the larger coal would flow over the bars and on down the chute until it struck the wind or curve at the mount of the chute, and would by this curve be deflected into a railroad car standing on another track.

This was the condition a short time before the plaintiff was injured. It became necessary to build a new wind at the end of the chute, and the plaintiff, who was the head carpenter in the service of the defendant, was directed to build the wind with his crew of carpenters. He was also directed to place a shield below the grate bars and above the wind for the purpose of catching coal when released by the gate, and cause it to drop through the opening in the chute at the grate bars, which plaintiff was also directed to remove. This left a hole in the bottom of the chute between the shield and the gate about 16 feet long. Plaintiff and his crew were engaged in building the wind for three or four days with the gate in position. While thus engaged, the defendant continued to dump coal into the chute at the head house in the ordinary and usual operation of its mines, with the exception that during these operations the coal would not be screened, but would all pass through the opening left by the removal of the screen bars into a car standing on the track nearest

the head house and under the opening. Throughout the time that coal was dumped into the chute while plaintiff was at work on the wind, the man at the head house would give timely warning of the intentions to dump the coal into the chute, and plaintiff and his assistants would get out of the chute. This was done with the knowledge of plaintiff and defendant.

Before the wind was completed, plaintiff was ordered by the defendant to remove the gate, and install a new one. This order was given March 1, 1911, and plaintiff was directed to do the work the next day. On the next day, March 2d, the chute was cleaned out and all coal removed, and the plaintiff was notified that it was ready for him to begin the building and installation of the new gate. Part of plaintiff's crew was still at work on the wind. Work on the gate began at 8 o'clock in the morning. During the progress of the work, the man at the head house called down twice, to know if coal could be dumped. At another time, and just a few minutes before plaintiff was injured, plaintiff was informed that because of the congestion of cars brought out of the mines at the head house, cars were getting scarce in the mine, and he was again asked if the gate was completed. He did not notify the man at the head house that the gate was completed. His assistants at work on the wind informed plaintiff that the wind was finished, and requested him to inspect it. He went from his place at the gate to the wind, and from an inspection of it, he discovered that his assistants had not inserted a bolt which he deemed

necessary to its proper completion. Plaintiff laid down on his side in the bottom of the chute, and was taking measurement for the required bolt, when the man at the head house dumped coal into the chute, which came down upon the plaintiff and injured him. The plaintiff's head was under a crossbar which passed through the chute at the wind, at a distance of about 18 inches from the floor. He was given no warning that coal would be dumped into the chute at the head house, but he heard it, and endeavored to extricate himself, but was unable to do so because of the crossbar.

The gate was not finished, and it had not been installed. The plaintiff says that he would have finished the work in 15 or 20 minutes if he had not been injured.

The court of civil appeals was of opinion that the plaintiff and the man at the head house were fellow servants, and for that reason the plaintiff was not entitled to recover. Among other things, that court said:

"The distinction in the two conditions of a safe place to work in and a safe place made unsafe by the act or negligence of a fellow servant is, it seems, plainly to be seen and recognized, and it is recognized in all the texts and decisions to which we have had access which treated of or dealt with cases involving the fellow-servant doctrine or rule of law. If a safe place furnished for an employee is made unsafe by the negligence of a fellow employee, and injury results for which the employer is liable, the whole foundation of

the fellow-servant doctrine, as well as all its incidents, is swept clear out of the realm of court administration of rights, and we need no negligence to abolish and remove it entirely from the field of jurisprudence.

"It is to be understood that we are not dealing with a case where an employer who sees or knows, or ought to know, that an employee, by his negligence or incapacity or ignorance has made or will make a safe place for another employee to work unsafe, stands up and fails to take prompt steps to protect his other employees; in such a case the law, as well as common justice, ought to hold him liable for injury to the nonnegligent employee."

"To hold that an employer is liable for an injury when he puts one of his employees in a safe place to work, in the event another employee or fellow servant by his negligence or omission to perform his duty or performs it recklessly, thereby causing injury to his coemployee and fellow servant, is confining the fellow-servant doctrine within narrower limits than any text or decision that we have been able to find."

There is no evidence to indicate that the coal chute was an unsafe place for plaintiff to work because of any inherent vice or defect in its construction. The very nature of the premises, and the uses to which they were put in the ordinary and usual prosecution of the master's work, would make the place unsafe while the chute was being used. If coal were not dumped in the chute, the place would be safe. It is also shown that plaintiff could have taken himself beyond the zone of

danger if he had been warned by the man at the head house that coal would be dumped.

As already stated, it was the custom of the defendant to warn plaintiff before coal was dumped in time for him to protect himself. Learned counsel for defendant contend that the rule or custom of giving warning was suspended at the time of the injury because the chute was "dismantled," and was in no condition to be used for dumping coal, and therefore the man at the head house was not forwarding the master's business when he dumped the coal in upon plaintiff, but was acting in disregard of the master's interest. It is said that the master, when he directed the man at the head house to cease dumping coal, and notified him of the presence of the plaintiff in the chute, discharged his full duty towards plaintiff. The correctness of this position would seem to depend upon whether there is evidence which would warrant the jury in concluding that the chute was in condition for use in the interest of the master's business at the time of the injury. It should be conceded that if the master had abandoned the work at the time of the injury, or if the chute was in such condition that it could not be used in the business of the master, and these facts were known to the man at the head house, his act in attempting to use an unfit instrumentality would not be within the scope of his employment, and for that reason the master would not be liable. If, however, the chute was usable in the business of the master, the man at the head house would be acting within the scope of

his employment, and in and about the business of the master, whether the chute was in the exact condition of its usual use or not; and this was a question for the jury. The plaintiff's evidence tends to show that the chute was usable, notwithstanding the absence of the gate, on account of the presence of the shield just below the hole in the bottom of the chute left by the removal of the screen bars. It is true that if used in such condition the coal would not be screened, but it is also true that there is evidence indicating that coal was being loaded on the railroad cars unscreened. Hence we conclude that there is evidence which would have warranted the jury in finding that the man at the head house was acting within the scope of his duty and in and about the business of the master when he dumped the last car of coal into the chute. Of course the business of the master at this place was not abandoned. It was merely temporarily suspended and was suspended for the sole reason that plaintiff had been directed to make the repairs heretofore detailed. The employees of defendant were still at work in the mine, and coal was being continually drawn out of the mine into cars that were parked at the head house. There was a railroad car on the track in position to receive coal that would come through the hole left by the removal of the screen bars. This fact is not stated directly in the evidence, but we think the jury were warranted in making such an inference.

The general rule of the common law is in force in this State, to the effect that a master is not responsible

to the servant for injuries resulting from the negligence of a fellow servant engaged in a common employment where there has been due care in the selection and employment of the fellow servant. *Railroad* v. *Wheeless,* 10 Lea, 741, 43 Am. Rep., 317; *Railroad* v. *Handman,* 13 Lea, 423; *Railroad* v. *Edwards,* 111 Tenn., 31, 76 S. W., 897; *Railroad* v. *Lahr,* 86 Tenn., 335, 6 S. W., 663; *Fox* v. *Sandford,* 4 Sneed, 36, 67 Am. Dec., 587, and the cases cited establish that the rule includes the risk of injuries, not only from the servant's want of skill and care, but also the risk of injuries from the negligent acts of his fellow servants; and, in order to charge the master, the negligent servant must so far stand in place of the master as to be charged in the particular matter with the performance of a duty towards his fellow servant, which, under the law, the master owes to such servant. *Railroad* v. *Handman,* supra; *Railroad* v. *Lahr,* supra. And upon this principle, it has been held that if a servant who is employed to represent the master in the general supervision of the work departs from the scope of his employment and does the work of a fellow servant, the master is not liable for his negligence while so engaged. *Fox* v. *Sandford,* supra; *Railroad* v. *Elliott,* 1 Cold., 611, 78 Am. Dec., 506; *Railroad* v. *Wheeless,* supra; *Railroad* v. *Rush,* 15 Lea, 151; *Railroad* v. *Handman,* supra; *Railroad* v. *Lahr,* supra.

The cases last cited, announcing the doctrine of the personal negligence of a superior servant, as well as all of our cases, recognize it to be true that if the

superior servant stands for the master in the performance of the negligent act which causes the injury, the master is liable. And particularly in *Railroad* v. *Edwards,* supra, it is stated that whether the superior servant stands in the place of the master is most satisfactorily determined by ascertaining whether such servant is charged with the performance of a duty towards the other servant which under the law, the master owes him. And the principle of that case is recognized, although not stated in words in *Railroad* v. *Wheeless,* supra. It would seem to follow, as a just and proper corollary of the cases referred to, that if the negligent servant has been designated by the master as the one to perform a personal duty which the master owes his other servants, his negligence in respect of the performance of that duty would be the negligence of the master, without regard to the general grade of his employment. It is for the master to say to whom and in what manner the personal duties which he owes his servants should be discharged. He may perform them in person, or he may designate others to stand for him in the matter of their performance, as he may see proper; but in either event, he is liable for negligence in the performance of the duty.

So the important inquiry in this case is whether the master owed to Maness the duty to warn him that coal would be dumped, and thus enable him to find a place of safety. If the duty existed, it would be a mere quibble upon words to say that the person to whom its performance was delegated, and whose negligence in

the discharge of such duty caused the injury, was the fellow servant of Maness. It is generally held by the American cases that the master cannot delegate the personal duties he owes his servant so as to relieve himself of liability for negligence in their performance.

In this case, it is not a matter of dispute as to whether the master owed the duty of warning to the plaintiff. This duty was conceded by the master assuming it on previous occasions. Plaintiff knew that the master had assumed to give the warning and relied upon it. As we understand learned counsel for defendant, this is not denied, but it is insisted that the rule was suspended at this particular time because the master had dismantled the chute, had ordered the man at the head house to cease using it, and had notified him of the presence of the plaintiff in the chute. But clearly this is a question of fact found against the defendant by the jury.

We should say, however, that if it were a matter of dispute as to the duty of the defendant to give warning to the plaintiff before coal was dumped into the chute, we would hold that such was its duty. We do not mean to say that, if two or more servants are engaged in a common employment under the same master, the master would be liable for the failure of each coservant to give warning to his fellow servants of sudden and unexpected danger which might arise in the performance of the details of the master's work. Such could not be the law under our cases cited, supra.

But the principle which controls this case, and which we hold to be a sound one, is thus stated by the supreme court of Minnesota, speaking through Mr. Justice Jaggard:

"When an employee is at work in a place safe in itself, but which by virtue of some independent work done for the master's purposes becomes dangerous, unless prior warning of the impending danger be given, and when the master has required such notice to be given, or has assumed to customarily give such warning through an employee, the person charged with that duty is a vice principal. For his negligence therein the master is liable." *Anderson* v. *Pittsburgh Coal Co.,* 108 Minn., 455, 122 N. W., 794, 26 L. R. A. (N. S.), 624.

The later cases upon this subject are very numerous and support the principle just stated. In addition to the Minnesota case, we cite the following as representative of the more recent judicial opinion and as indicating the modern trend of judicial decision. *Western Electric Co.* v. *Hanselmann,* 69 C. C. A., 346, 136 Fed., 564, 70 L. R. A., 765; *Toledo Brewing & Malting Co.* v. *Bosch,* 41 C. C. A., 482, 101 Fed., 530; *Orman* v. *Salvo,* 54 C. C. A., 265, 117 Fed., 233; *Gustave Pantzar* v. *Tilly Foster Iron Mine Co.,* 99 N. Y. 368, 2 N. E., 24; *McGovern* v. *Railroad,* 123 N. Y., 280, 25 N. E., 373; *Bellville Stone Co.* v. *Mooney,* 61 N. J. L., 253, 39 Atl., 764, 39 L. R. A., 834; *Peters* v. *George,* 83 C. C. A., 408, 154 Fed., 634; *National Steel Co.* v. *Lowe,* 62 C. C. A., 229, 127 Fed., 311; *Curley* v. *Hoff,* 62 N. J. L.,

760, 42 Atl., 731; *Brick Co.* v. *Shanks*, 69 Kan., 306, 76 Pac., 856; *Hendrickson* v. *Gypsum Co.*, 133 Iowa, 89, 110 N. W., 322, 9 L. R. A. (N. S.), 555, 12 Ann. Cas., 246; *Brice-Nash* v. *Barton Co.*, 79 Kan., 110, 98 Pac., 768, 19 L. R. A. (N. S.), 751, 131 Am. St. Rep., 284.

There are many of the older cases which apply the generally accepted formula of the doctrine of fellow servant in a dogmatic way to facts similar to those of this case, and which are in conflict with our holding here, and the authorities cited. There are a few of the more recent cases which still adhere strictly to this ancient doctrine of fellow servant and apply it to any negligent act of a servant whereby a coservant is injured and hold the master not to be liable.

Compare sections 580 and 601 of the first edition of Labatt's Master & Servant, with pages 29 and 36, vol. 3, of the last edition of the same work.

However, we do not wish to be understood as holding, and we do not hold, that the master is under the personal duty of giving notice to servants engaged in a common employment of dangers arising from the execution of the details of the work which they are employed to do. *American Bridge Co.* v. *Valente*, 7 Pennewill (Del.), 370, 73 Atl., 400, Ann. Cas., 1912D, 69. This case does not present that question. What we do hold is that the master may not place his servant at work in a place made unsafe by the nature of work of other servants performing services for the master, disconnected with work of the injured servant, without due care to furnish such servant adequate pro-

tection. *Va. Iron & Coal Co.* v. *Hamilton,* 107 Tenn., 705, 65 S. W., 401. If it is necessary to give warning, he must do that. *Freeman* v. *Railroad,* 107 Tenn., 340, 64 S. W., 1. It is no answer to his liability to say that a fellow servant was designated to give the warning and was negligent. The giving of the warning is a masterial duty. In this case it had no connection with the mining of coal or with dumping it into the chute, and thence onto the railroad cars, or with repairing the chute. It was as separate and distinct from the performance of the ordinary work of the common employment as the duty of promulgating rules for the safety of employees. And the failure to give the warning could no more be said to be the negligence of a coservant than the failure to promulgate rules. It relates to the personal duty which the master owes to every servant not to needlessly expose him to peril, and it has especial application to the facts of this case because the servant was engaged in engrossing work and in a position where it was impossible for him to look out for himself. This the master knew because he ordered him to do the particular thing and this the fellow servant at the head house knew. Therefore, when the man at the head house was designated as the one to give the warning he stood in respect to that particular duty as the representative of the master, and his negligence was the negligence of the master.

The proximate cause of plaintiff's injury is the failure to warn, and not the dumping of the coal. It

Maness v. Coal Corporation.

is shown beyond doubt that coal had been previously dumped, and could have been dumped on this occasion, with safety to the plaintiff if he had been warned in due time.